# CHARLESTON.

ACADIAN COAL & LUMBER COMPANY *v.* BROOKS RUN LUMBER COMPANY *et als.*

Submitted April 26, 1921.    Decided May 3, 1921.

1.  FRAUDULENT CONVEYANCES—*Mortgage on Lumber Company's Property Held Not Fraudulent per se or for Matter Appearing on Face.*

    A mortgage of all of the property of a corporation engaged in timbering operations, consisting of standing timber to be cut within a limited time, saw-mills, logging trucks, railways, buildings, implements and appliances and logs and lumber cut and manufactured, executed to secure indebtedness therein admitted and payment thereof in installments at short in-

tervals promised, and providing for possession, control and operation of the business by the mortgagor with power and authority in it, to sell "lumber or other property in the course of its business" without interference on account of the mortgage, and "with full power to pass legal title to any and all property and lumber that it may sell in the progress of its business," subject to a requirement that a large specific amount of lumber shall be retained on sticks on its lumber yards, until the debt shall have been paid, and for foreclosure upon default as to any payment so required, is not fraudulent *per se* or for matter appearing on the face thereof. (p. 603).

2. VENDOR AND PURCHASER—*Vendor's Lien in Timber Deed Construed to Secure Only Amounts Mentioned in Purchase Money Notes.*

A vendor's lien reserved in a deed conveying standing timber and rights of way, in consideration of a gross price evidenced by promissory notes, bearing the same date as a contract between the parties, reciting a sale of the timber by the acre and for a larger sum than that recited in the deed and evidenced by the notes, and also stipulating for payment of the value of improvements and equipment sold with the timber, which contract is not mentioned nor referred to in the deed nor recorded therewith and does not itself reserve any lien, secures only the amount mentioned in such notes, they being expressly mentioned in the reservation, without any indication of any additional indebtedness for purchase money. (p. 605).

3. SAME—*Statutory Vendor's Lien Can be Created Only by Express Contract.*

Under the statute abolishing the implied vendor's lien and providing for a statutory vendor's lien, such a lien can be created only by express contract. It can neither arise nor be extended by implication. (p. 606).

4. SAME—*Extent of Vendor's Lien on Timber Cut Stated.*

Provision in such a reservation for a lien upon timber cut and manufactured, to secure purchase money, while on the premises, extends to and binds lumber at the mill and on the lumber yards of the vendee, situated on the vendor's land but not on the particular tract on which the timber constituting the subject of the sale and conveyance stood. (p. 606).

5. LOGS AND LOGGING—*Extent of Vendor's Common-Law Lien Under Timber Deed Construed.*

The vendor in such case has the common law seller's lien

88 W. Va.

on the timber cut under such deed and contract, while it remains upon his land, provided it is not otherwise stipulated in the deed or contract, for purchase money not secured by the vendors lien reserved in the deed, but not upon the standing timber so sold and conveyed, timber being part of the land until severed and the lien a law applicable to personal property only.  (p. 608).

6.  MORTGAGES—VENDOR AND PURCHASER—*Vendor's Lien Held Superior to all Subsequent Liens Against Vendee.*

Such lien is superior to and prevails over all subsequent liens created by, or obtained against, the vendee, whether by judgment, execution, mortgage or otherwise.  (p. 610).

7.  LOGS AND LOGGING—*Vendor's Lien Held to Secure Both Timber and Sawmill Equipment.*

If, in such case, the contract of sale of the timber and the equipment was entire, such lien secures the purchase money of both the timber and the equipment, even though the contract placed separate prices upon them, and extends to and binds both classes of the property, except the standing timber.  (p. 609).

8.  SAME—*Contract for Sale of Timber and Sawmill Equipment Held Entire.*

If the contract executed contemporaneously with the deed, in such case, recites the conveyance of the timber and reservation of the vendors lien, as above described, and a sale by the acre for a sum in excess of the price recited in the deed, and of all of the logging and manufacturing equipment at a price equal to the cost thereof, to be later ascertained, and then provides that the residue of the price of the timber and the price of the equipment so to be fixed shall be paid monthly at a certain rate per thousand feet for the lumber shipped, upon monthly statements, the contract is entire.  (p. 609).

Appeal from Circuit Court, Braxton County.

Suit by the Acadian Coal & Lumber Company against the Brooks Run Lumber Company, the South Side Trust Company of Pittsburgh, and others.  Decree for complainant, and defendant Trust Company alone appeals.

*Reversed in part.  Affirmed in part.  Remanded.*

*Ralph L. Smith* and *Hoffheimer & Templeman,* for appellant.

*Haymond & Fox,* for appellee.

*W. L. Armstrong,* for Burnsville Grocery Company and others.

POFFENBARGER, JUDGE:

Review of the decree complained of on this appeal involves conflicting claims and contentions as to validity and priority of liens upon the assets of an insolvent corporation, the business and affairs of which are wound up and disposed of by that decree. The appellant, South Side Trust Company of Pittsburgh, complains of denial of the validity of a mortgage for the sum of $17,500.00, held by it, as executor of the will of Charles E. Breitweiser, deceased. It also complains of the interpretation of a vendors lien in favor of the plaintiff, Acadian Coal and Lumber Company, under which liens for large amounts were adjudicated in its favor. Two judgment creditors, the Burnsville Milling Co. and the Burnsville Grocery Co., in whose favor liens were adjudicated, are not entirely satisfied with the position accorded them, and they complain of certain alleged errors in the decree.

The defunct corporation whose affairs are involved is known as the Brooks Run Lumber Company. Its property consisted originally of the timber on a tract of land containing 1,430 acres and certain mills, logging roads and other timbering instrumentalities and implements, all of which it indirectly obtained from the Acadian Coal and Lumber Company, by means of a deed and a contract executed by the vendor to one A. G. Breitweiser, who, with his associates, organized the Brooks Run Lumber Company and conveyed the property to it. Before the conveyance the original owner had started the timbering operation on the land and expended considerable money therein. It and A. G. Breitweiser entered into a contract pertaining to the timber, purchase money and rights of way and privileges, and bearing the same date as the deed by which the conveyance was made, December 29, 1916. Recordation of the deed seems to be admitted, but the contract admittedly was not recorded until after this suit was instituted and a receiver appointed.

Tested by the terms of the contract, the sale was by the

acre, the purchase money of the timber amounting . to $28,600.00, and the equipment was to be paid for on the basis of cost to be ascertained later. Of the entire purchase money, $25,000.00 was represented by twenty-five $1,000.00 notes executed by the purchaser. The balance was to be paid monthly, at the rate of $3.00 per 1,000 feet, as the timber should be shipped, on monthly statements to be rendered. But the deed purports a sale in gross, of the timber on the land and timbering rights and privileges thereon, for $25,000.00 evidenced by the notes and secured by a vendors lien reserved, the lien clause reading as follows: "A vendor's lien is hereby herein retained on the timber and rights in connection therewith hereinbefore granted to secure the payment of the said purchase money notes, and this lien shall be in force against the timber standing and also upon the timber cut by the party of the second part and lumber manufactured therefrom while . on the premises." The deed says nothing about the equipment for timbering then on the land. A controversy as to the extent of this lien turns upon the interpretation of the clause "and also upon the timber cut by the party of the second part and lumber manufactured therefrom while on the premises." The mill and yards were not on the 1,430 acre tract of land. They were situated on another 56 acre tract. Although the contract reserves no lien, unless a mere reference to it in the deed suffices, and was not recorded, it is argued that the two papers may be read together and a lien thus established for the excess of purchase money over the $25,000.00.

The commissioner and the court reached this conclusion by reading them in connection with the recorded deed by which A. G. Breitweiser conveyed the property to the Brooks Run Lumber Co. By that deed, he conveyed, in consideration of $10.00 paid and other valuable considerations, all the right, title and interest in and to the timber on the 1,430 acres of land, conveyed to him by the Acadian Coal and Lumber Co., "by deeds and writings, dated December 29th, 1916, and also all lumber, railways, buildings and equipment whatever used" by him, in connection with his lumber operations at and about Brooks Run, Laurel Creek. The real consideration, of course,

was this obligation incurred by acceptance of the deed: "The said Brooks Run Lumber Company by this grant takes the said property of the said A. G. Breitweiser as it stands in him, and to continue operations of manufacturing and of sale of lumber, and to take care of all contracts and undertakings of the said Breitweiser in connection with the said operations so that the liabilities of the said A. G. Breitweiser individually in connection therewith cease, and the said Brooks Run Lumber Company assumes all liabilities of the business as it now stands."

No attempt will be made to define the transactions following the execution of the first deed, beyond the extent of necessity. The twenty-five notes were endorsed by the payee, Acadian Coal & Lumber Company, and redelivered by it to A. G. Breitweiser, the maker, to be used by him in efforts to raise funds for payment of the purchase money and expenses of carrying on the work of manufacturing and selling the timber. Fourteen of them were negotiated to the Union National Bank of Clarksburg, four of which were afterwards paid by the Brooks Run Lumber Co. Seven of them were taken by Charles E. Breitweiser and are now held by the appellant as his executor. The remaining four were deposited with the People's National Bank of Pittsburgh as collateral security for a $4,000.00 note of the Brooks Run Lumber Company, on which Charles E. Breitweiser was endorser or guarantor. On that note the maker paid $2,500.00 and Breitweiser paid the other $1,500.00 and took an assignment of the four $1,000.00 notes deposited as collateral. The bill filed by the Acadian Coal and Lumber Company alleges that about $16,000.00 of the money raised on the notes was applied to the payment of its obligations and the residue, $9,000.00, advanced by it to the Brooks Run Lumber Company.

Near the date of the purchase of the timber Breitweiser and his associates organized another corporation known as the Breitweiser Lumber Company, which seems to have been the sales agent of the Brooks Run Lumber Company, and its successor, the Miners' & Manufacturers' Lumber Company, claims large indebtedness to the agent company was incurred by its

principal for moneys advanced, interest and obligations paid, services rendered, losses on lumber and other accounts, to secure which a mortgage was executed by the Brooks Run Lumber Company, August 8, 1917, in which such indebtedness was described as amounting to $17,500.00. It seems to be admitted that this mortgage was promptly recorded. On August 27, 1917, it was assigned to Charles E. Breitweiser for and in consideration of $15,000.00, which sum was credited on the account the mortgage was given to secure. At about that time the two Breitweisers withdrew from the Breitweiser Lumber Company and its name was changed to Miners' and Manufacturers' Lumber Company.

The affairs of the Brooks Run Lumber Company being in bad condition and two judgments having been obtained against it, one by the Burnsville Milling Company for $467.32 and costs and the other by the Burnsville Grocery Company for $1,151.78 and costs, and executions issued thereon having been levied upon some of its lumber, the Acadian Coal and Lumber Company, claiming to be a lien creditor in large amounts, brought this suit, praying in its bill for the appointment of a receiver to take charge of the property and operate it. Agreeably to the prayer, C. H. Bland was appointed receiver, and as such conducted the operations for a considerable period of time.

From the receiver's report and the findings of the Commissioner, it has been ascertained that about 4,222,000 feet of lumber was obtained from the land, 3,100,000 feet shipped before appointment of the receiver, 463,000 feet on the yards at that time and 659,000 feet manufactured by the receiver. The plaintiff claims and has been allowed, on the basis of this quantity, $16,981.00, as being secured by the vendor's lien in the deed as aided and expanded by the $3.00 per 1000 clause of the unrecorded contract, which sum is very much less than it was entitled to by the terms of the contract, on account of the excess over $25,000.00 and the cost of the equipment.

At the date of the decree appealed from, there was in the hands of the special receiver, including the proceeds of the sale

of all the assets of the company, $38,332.93. · The property,. sold for a lump sum, included certain personal property on which the Moon Lumber Company has a specific lien for $2,580.53, by a deed of trust, which sum the decree ordered to be paid out of the money in the hands of the receiver, upon the theory that there had been an offer of $3,200.00 for the property on which said debt was secured, wherefore such sum must have been included in the purchase price, as coming from the property, and the residue of its estimated value, $619.47, was ordered to be applied to the payment of costs. This left $35,132.93. On that fund the Union National Bank's debt, representing ten of the notes and interest and amounting to $13,454.60, was made the first lien; the debt due the South Side Trust Company, executor, representing seven of the notes and interest and amounting to $9,418.22, the second lien; the South Side Trust Company, executor, representing the $1,500.00 paid on the $4,000.00 note, and interest, and amounting to $1,684.07, the third lien; the Acadian Coal and Lumber Company debt, representing the balance of the four notes used as collateral and taken over by Breitweiser and interest, and amounting to $3,702.49, the fourth lien; the Burnsville Milling Company debt, $548.11, the fifth; the Burnsville Grocery Company's debt, $1,329.75, the sixth; the Acadian Coal and Lumber Company's debt of $16,981.00, including $4,302.08, as purchase money of the timber in excess of the $25,000.00 in notes and interest, but subject to a credit for the amount of the Moon Lumber Co. debt, it being a debt of the vendor, the seventh lien; and all general debts amounting to many thousands of dollars, the eighth lien, to be shared ratably among them. The $17,500.00 mortgage was held to be fraudulent and void on its face, as to creditors, but good as between the parties, wherefore the $20,279.00 debt represented by it was postponed to all other debts. On this basis, there is nothing left for general creditors, nor for the appellant claiming under the mortgage.

As the two execution creditors would obtain the full amount due them under this decree, it is insisted that they are not prejudiced by any errors that may have been committed. This may be true, but, if the contentions of the appellant are

well grounded, the decree is fundamentally wrong and some of their assignments of error may have to be sustained.

Appellant's fifth assignment of error assaults the inter- . pretation of the vendors lien provision of the deed and denies that the Acadian Coal and Lumber Company has any lien for the sum of $16,981.00 allowed, on the basis of the value of the timber in excess of $25,000.00 and the cost of equipment. But, if the mortgage is fraudulent and void on its face because fraudulent, appellant is likely not prejudiced by any error in the decree, pertaining to the claims of other creditors. Hence, the first inquiry is whether the mortgage is void.

The provision upon which it was adjudged and held to be fraudulent *per se* reads as follows: ''The mortgagor shall retain the possession and control of its business, being that of the manufacture and sale of lumber at its place of business at Prestonia, West Virginia, and shall in all respects proceed with the manufacture and sale of timber or of other property in the course of its business without interference on account of this mortgage and with full power to pass legal title to any and all property and lumber that it may sell in the progress of its business, but the said mortgagor shall until the said debt shall have been paid retain on sticks on its lumber yards at least as much as 500,000 feet of lumber.''

This provision must be read in connection with others, to ascertain the legal effect of the instrument and the intention of the parties, as disclosed by its terms. It acknowledges indebtedness to the extent of $17,500.00, payable in installments of $1,500.00 per month at the least, the first one of them to be paid one month after its date, and contains an express promise so to make payments. It also provides for right of foreclosure by suit or proper judicial procedure at any time after default made as to any of the installments.

Considered in the light of the character of the property it conveyed, the instrument does not fall within the class of those held to be fraudulent on their faces, because so drawn as to enable the debtor to appropriate the property to his own use or to protect him in the possession and enjoyment

thereof, to the detriment of his creditors.    It contemplated rapid payment of the debt secured.    Besides, it required the mortgagor to keep on hand unsold, at all times, a quantity of lumber practically sufficient to pay the debt.    Whether a deed of trust or mortgage is fraudulent on its face does not depend upon technical grounds.    The question is governed by practical consideration and elements.    If by legal operation, it defrauds or hinders and delays creditors, it is fraudulent *per se*.    If it discloses intention on its face to effect such results, it is likewise fraudulent.    In legal effect, this mortgage could not have improperly obstructed the right of any unsecured creditor.    The mortgagee had legal and moral right to take security for its debt, hence the taking thereof was no legal invasion of the right of another creditor, within the meaning of the law of fraudulent conveyances.    While the property was left in the possession of the mortgagor with right to cut and market the timber, it was not allowed inactive possession and enjoyment.    If it did not rapidly pay the debt, there was right of foreclosure in the mortgagor.

Nor does the instrument on its face disclose any evidence of fraudulent intention respecting creditors.    The nature of the property and the purpose and privileges of the possession clearly indicated intention to effect payment of the debt out of the subject of the mortgage.    The principal part of that subject was standing timber, real estate, insusceptible of ready conversion into money.    The mortgagor was not authorized to sell the standing timber.    It was left in possession and control of its business, the manufacture and sale of lumber, with power to sell lumber or other property, in the course of such business.    This language does not import intention to allow it to sell the standing timber and appropriate the proceeds of the sale.    To work out the timber on so large a tract of land required a considerable period of time and the expenditure of large sums of money.    The evident purpose was to provide for payment of the debt out of the sales of the lumber and permit the use of portions of the proceeds of sales, in discharge of the operating expenses.    The property was not of a transitory nature. It was radically different from a stock of goods in a store and from materials and ma-

chinery in a mill or factory or live stock on a farm. Hence, the provision according right of possession to the mortgagor does not fall within the principles declared and applied so often in the disposition of such provisions in mortgages of transitory or movable property. In view of this difference, the authorities most strongly relied upon in support of the decree, *Gilbert* v. *Peppers,* 65 W. Va. 355, *Livesay's* v. *Beard,* 22 W. Va. 585, *Landerman* v. *Wilson,* 29 W. Va. 702, *Gardner* v. *Johnson,* 9 W. Va. 403, and *Kuhn* v. *Mack,* 4 W. Va. 186, do not apply.

It is suggested in the briefs as well as in the report of the commissioner that the mortgage debt was not proved. We are unable to concur in that view. An itemized account of the indebtedness was filed with the answer of the Miners and Manufacturers Lumber Company, successor of the Breitweiser Lumber Company, and the correctness of that account was fully proved by the testimony of a witness under whose supervision it was made up from the books and who further testified to his personal knowledge of all of the transactions upon which the account is based. Although this witness said, on cross-examination, that part of the money was advanced to A. G. Breitweiser, before the Brooks Run Lumber Company was organized, the account and the mortgage make it very clear, that such money went into the timber enterprise and was treated as a debt of the company. It is in the account and the mortgagor promised in the mortgage to pay it.

This conclusion necessitates inquiry as to whether the lien of the mortgage conflicts with the vendors lien and, if so, to what extent. Both cover the standing timber and, in so far as they conflict, the latter prevails, of course. But, if it does not extend to all of the subjects of the mortgage lien, there is no conflict as to what it does not include. It is necessary, therefore, to determine now the amount of the debt secured by it and the subject of such security.

Unless the terms of the lien can be enlarged by the unrecorded contract, it secures only the twenty-five $1,000.00 notes. As it does not in any way mention or refer to the contract, it is not perceived how it could constitute notice to any

purchaser or preclude the right of a lien creditor, as to anything not found in the deed. It is said the recordation of the deed from Breitweiser to the Brooks Run Lumber Company, reciting the conveyance to him "by deeds and writings, dated December 29th, 1916," gave notice of the existence of the contract. This might suffice as notice to a subsequent purchaser, but a lien creditor stands upon a different footing. His status is fixed by the record, and not by actual notice, while a purchaser is bound by actual notice and, if he has such notice or notice of facts sufficient to put him upon inquiry, it is immaterial whether the instrument of which he has such notice is recorded or not. This distinction is made in the statute itself. Code, ch. 74, sec. 5. If, however, the contract be read in connection with the deed, for any purpose or as to any person, either creditor or purchaser, it reserves no lien for the purchase money of either the timber or the equipment. The only reservation of a lien is found in the deed and that is limited in express terms to the "purchase money notes" therein mentioned and described. The lien cannot be extended beyond its terms, even though they do not include all of the indebtedness they should have covered. *Craig* v. *Gauley Coal Land Co.*, 73 W. Va., 624. Hence, only the notes were secured by the lien.

They were secured upon the timber and rights granted by the deed and upon timber and lumber manufactured "while on the premises." The limitation of the lien by its terms logically applies to the property as well as the debt. There can be no reason for a distinction in this respect. The lien must be created by express contract. It cannot arise by implication. Hence, it cannot extend beyond the terms of the contract in any respect. Timber and lumber not on the premises, or that has been removed from the premises, is not included. The word "premises," however, does not necessarily mean the 1430 acre tract of land. It means all of the grounds or tracts of land on which the lumber operations are conducted. The purpose of the recorded reservation is to give notice to purchasers and fix the status of lien creditors. It is not unusual for the mill and lumber yards of such an

·operation as is described in the deed to be located on a lot ·or parcel of land near to or adjoining the tract from which the timber is taken for manufacture. It would be unreason- able to suppose all of the lumber manufactured from timber ·on a tract of land is to be either sawed or stacked on the land from which it is taken. A practical man would say ''prem- ises'' as used here refers to the mill site and yards, whether ·on the granted land or not, as well as the land from which the timber is cut, and the term is to be taken in the sense in which a practical man would employ it. The mill site and lumber yards were shown, by extrinsic evidence, to be, in this case, on a 56 acre tract of land owned by the grantors and not included in the 1430 acre tract. · Our conclusion is that the lien extended to timber cut and lumber manufactured while at the mill and on the lumber yard awaiting transpor- tation in some way.

It is impossible in view of these conclusions and other facts now to be stated, to find a statutory vendors lien in favor of the Acadian Coal and Lumber Company, for more than the item of $3,702.49, and its right to that is resisted.    All but four of the notes secured by the lien were actually negotiated and seventeen of them remain unpaid.    Four of those that were sold have been paid off by the Brooks Run Lumber Com- pany.    The four not sold were merely, pledged for the debt of the Brooks Run Lumber Company and redeemed to the ex- tent of $2,500.00, by payment on the debt for which they were pledged.    How the Acadian Coal and Lumber Company ·can have any lien for the amount of the four actually paid off after negotiation thereof to the Union  National  Bank, as against a lien creditor or even a purchaser with notice, it is impossible to see.. If the money originally obtained for them was used by the lumber company, the lien was held after ·sale thereof, by the bank, not the Acadian Company.   Pay- ment of these notes extinguished them as obligations and *pro tanto* extinguished the lien.    If the vendor permitted the vendee to use the money for which they were sold, a new ob- ligation must have arisen between them, for the bank then held the lien, not the vendor.    The latter was a mere unse-

cured creditor of the lumber company to the extent of the money so used. If the vendor loaned the lumber company the fourteen notes of which said four were a part, for use in raising money for its own purposes, and they were so used, payment of the four afterwards taken up might possibly be treated as a redemption thereof. But there is no proof that these four notes were so parted with and used. Who got the money from the Union National Bank, on them, is not disclosed. The Acadian Company may have obtained the money. No lien for the amounts of these four notes is claimed and we are unable to see how such a claim, if made, could be sustained.

The status of the $2,500.00 paid on the $4,000.00 note of the Brooks Run Lumber Company, for which four of the $1,000.00 notes were pledged, is different. They were merely pledged and then redeemed. Chas. E. Breitweiser was not a purchaser thereof. He paid nothing for them. He simply paid the $1,500.00 he was liable for on the note and took the collateral by assignment, for indemnity. Reimbursement for his payment, with interest, makes him whole, and that is all he is entitled to. Those four notes are unpaid and Breitweiser's estate is entitled to $1,500.00 out of them and the Acadian Company to the residue of $2,500.00. In other words, the four unpaid notes with their interest are secured by the lien and the amount is to be divided on the basis here indicated, between appellant and the Acadian Coal and Lumber Company.

This definition and limitation of the statutory vendors lien, however, does not terminate the inquiry as to the right of the Acadian Coal and Lumber Company. It claims a common law lien, known as the seller's lien, based upon the right of detention of personal property after sale thereof and passage of the title, until it is paid for. The vendor of standing timber to be cut and removed from his land by the vendee, has such a lien on the timber and the lumber manufactured, as long as it remains upon his premises, unless it is otherwise stipulated in the contract. While it remains on his premises, it is deemed to be within his possession, not-

withstanding the cutting and manufacture thereof by the vendee and his limited control of the premises. *Justice* v. *Moore,* 69 W. Va. 51, 55; *Curtin* v. *Isaacson,* 36 W. Va. 391; *Wiggin* v. *Mankin,* 65 W. Va. 219. It is not otherwise stipulated in the unrecorded contract. This lien was not destroyed nor lost by failure to require payment in conformity with the contract, as to the 3,100,000 feet of timber removed. Release of the lien as to part of the property, by relinquishment of possession thereof without payment, does not destroy nor impair it as to the property still held. *Justice* v. *Moore,* cited.

Whether this lien on the timber extends beyond the excess of the purchase money thereof, over the $25,000.00 represented by the notes, namely, $3,600.00, and includes the sale price of the equipment, and the lien for the price of the equipment covers the timber as well as the equipment, depends upon the provisions of the contract and the interpretation thereof. By the contract, separate prices were put upon the timber and the equipment, but that manifestly was done only for purposes of convenience. The timber was priced by the acre and the equipment at its cost left open for subsequent ascertainment. Both were sold together, at the same time and by the same contract. Part of the entire consideration was provided for by notes and the vendors lien, and the contract provided that "the residue on account of the timber and other property and payments made in improvements and preparation for the manufacture of the timber into lumber shall be paid monthly and at the rate of Three Dollars per thousand feet for the lumber shipped." Obviously, the contract was entire and the seller's lien included all of the purchase money not provided for in the notes and extended to all of the property. There can be no doubt about the entirety of the contract. *Rollyson* v. *Bourn,* 85 W. Va. 15; *Herman* v. *Goddard,* 82 W. Va. 520. As it was entire, we think it clearly follows that the common law lien extends to all of the debt, except the notes, and all of the property as to which it has not been released by relinquishment of possession.

It is not perceived how this lien can extend to and cover the standing timber. It pertains to personal property and is part of the law of such property. Standing timber until severed, is part of the real estate. The deed and contract conferred upon the vendee a license to sever it, coupled with a grant thereof, but, until severed, it is real estate. In the three timber cases, above referred to and disposed of on the theory of the existence and applicability of such lien, severance had occurred and the question now under consideration did not arise. The deed conveying this timber, which is to be read and considered with the contract, for determination of the rights of the parties, allows six years for severance and provides for reverter after that period as to all timber not severed within it. Much of the timber was still standing when the property of the Brooks Run Lumber Company was sold, and a large part of the fund now in the hands of the court represents the value of such timber. We are aware of no authority legally justifying application of the common law seller's lien to timber still standing and subject to reverter by reason of failure to sever within the time limit.

Just how much of the fund now in the hands of the court was derived from the sale of the standing timber cannot be safely determined from the record as it now stands. But, as to that part, there is no lien in favor of the Acadian Coal and Lumber Company, except for its share of the four notes secured by the vendors lien above described amounting, with its interest, to $3,702.49. As to the residue of that fund, the mortgage debt of the appellant constitutes the fifth lien and will fully absorb it if prior liens leave anything.

This lien takes precedence over the mortgage, *Justice* v. *Moore,* cited, and also over the execution levied on the lumber on the yards. *Wall* v. *N. & W. Railway Co.,* 52 W. Va. 485; *Withers* v. *Carter,* 4 Gratt. 407.

From these conclusions it obviously results that the decree complained of erroneously accorded to the Burnsville Milling Company the fifth place in the order of liens, the Burnsville Grocery Co., the sixth and the Acadian Coal and Lumber Co. the seventh, and also erroneously postponed the

debt represented and secured by the appellant's mortgage. The mortgage debt stands next to that of the Acadian Company in the order of priority, except as to the proceeds of the standing timber, and the two execution liens follow it. There is no ground upon which the liens found and decreed to be first, second, third and fourth upon the entire fund still held by the court, can be disturbed. The Acadian Company's common law lien is the fifth; on all of the fund except the proceeds of the standing timber; the South Side Trust Company's mortgage lien for $20,279.00 the sixth, on all save the proceeds of the standing timber and the fifth on such proceeds; the Burnsville Milling Company's, the seventh; and the Burnsville Grocery Company's, the eight; and all other debts, sharing *pro rata,* constitute the ninth. It is equally apparent that the court improperly overruled appellant's third exception to the Commissioner's report, for its having accorded to the Bunrnsville Milling Co. and the Burnsville Grocery Co. second liens on certain stacks of lumber on which executions had been levied, and its fourth exception thereto, for its having declared the mortgage invalid. Its first exception based upon the finding of a debt due from the Acadian Coal and Lumber Company to Thomas McCabe, as constituting a lien on any sum to which that company may be entitled, and its fifth exception thereto, based upon priority given the Acadian Company debt over that of its mortgage debt, were properly overruled.

The decree complained of will be reversed in so far as it adjudicates invalidity of appellant's mortgage and postpones the mortgage debt to all other liens and general debts and fixes the liens of the Burnsville Milling Company, the Burnsville Grocery Company, the Acadian Coal and Lumber Company's lien for $16,981.00, the general debts and said mortgage debt, and overruled appellant's third and fourth exceptions to the Commissioners report. It will be so modified as to sustain said exceptions and accord the lien debts, as to which it is erroneous as aforesaid, the places, priorities, rank and dignity in the order of liens hereinbefore ascer-

tained and specified, and, as so corrected and modified, it will be affirmed and the cause remanded.

*Reversed in part.   Affirmed in part.   Remanded.*