# CHARLESTON.

WYOMING COAL SALES COMPANY *v.* SMITH-POCAHONTAS COAL COMPANY and J. C. PACK

(No. 6149)

Submitted May 2, 1928.          Decided May 8, 1928.

1.  CORPORATIONS—*Rights of General Creditor in Solvent Corporation's Assets Are Not Essentially Different From Rights of Such Creditor of Individual in Individual's Property; Solvent Corporation Holds Its Property Free From Creditor Who Has Acquired no Lien.*

    The rights of a general creditor of a solvent corporation in the corporate assets are not essentially different from the rights of such a creditor of an individual in the property of the latter. A solvent corporation holds its property as an individual holds his—free from the grasp of a creditor who has acquired no lien. (p. 614.)

    (Corporations, 14a C. J. § 3064.)

2.  SAME—*President of Corporation Needing Funds May Lend it Money and Take Lien on Corporation's Property; Where President's Lending Corporation Money and Taking Lien on its Property is Open and Otherwise Free From Blame, it Does Not Constitute Preference if Corporation Later Becomes Insolvent.*

    It is lawful for the president of a corporation which needs funds, to loan it money and secure the loan by a lien on its property. When such a transaction is open and otherwise free from blame, it does not constitute a preference upon the corporation subsequently becoming insolvent. (p. 614.)

    (Corporations, 14a C. J. §§ 1902, 3087.)

3.  EQUITY—*Rule That Equity Will Retain Jurisdiction Once Assumed, and Dispose of All Matters in Litigation, is Limited to Cases Where Such Jurisdiction Has Been Rightfully Invoked; Equitable Right Must be Both Averred and Proved Before Purely Legal Rights Will be Adjudicated by Chancery Court.*

    The rule that equity will retain jurisdiction once assumed, and dispose of all matters in litigation is limited to cases where that jurisdiction has been rightfully invoked. An equitable right must be both averred and proved before a purely legal right will be adjudicated by a court of chancery. (p. 620.)

    (Equity, 21 C. J. § 123.)

4.  PRIOR CASE DISTINGUISHED—
    *Gilbert* v. *Peppers*, 65 W. Va. 355, distinguished. .(p. 617.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Appeal from Circuit Court, Raleigh County.

Suit by the Wyoming Coal Sales Company against the Smith-Pocahontas Coal Company and another. From a decree for plaintiff, defendants appeal.

> *Decree reversed; bill dismissed without prejudice as to the named defendant.*

*McGinnis & McGinnis* and *Reynolds & Reynolds*, for appellants.

*File, Goldsmith & Scherer* and *J. Albert Toler*, for appellee.

HATCHER, JUDGE:

The plaintiff was a coal selling agency. The Smith-Pocahontas Coal Company conducted a coal mining operation in Wyoming county. Its property was sold under a deed of trust and purchased by J. C. Pack. The Poca-Pack Coal Company is Pack's grantee of that property. Pack purchased some stock in 1918 in the Smith-Pocahontas Coal Company (hereinafter usually referred to as "the company" or "the coal company"). In 1919 he became a director, and on April 17, 1924, he was made its president. The financial statement of the company for the year ending December 31, 1923, shows an aggregate investment in permanent improvements, real estate, mine equipment and other personal property, less depreciation, of $304,964.17, and notes and accounts payable amounting to $59,818.28. Included in the last list is the entry of $10,345.91 in favor of plaintiff. In the summary of losses for that year is a demurrage charge of $13,359.91. While the books of the company gave no indication of insolvency at that time, the company was badly in need of money, and its plant was deteriorating for lack of funds. On February 4, 1924, the board of directors resolved that it was necessary in order to rehabilitate the plant and reestablish its credit, to negotiate a loan not exceeding $40,000.00. The loan was not secured, and Pack accepted the presidency upon the condition that bonds of the company to the extent of $75,000.00 be sold for the purpose of financing

it. On May 1st, the stockholders authorized the issuance of bonds to that extent, and the execution of a deed of trust on all of the property and assets of the company to secure the payment of the bonds. The proceeds of the bonds were to be applied, according to the language of the stockholders' resolution, as follows: "The said Board of Directors are further fully authorized and empowered to apply the proceeds of a sale of said bonds to the discharge and payment of the existing indebtedness of the Company, so far as necessary, and the residue shall be applied for betterment to the plant and mining operations of the Company and in the conduct of the business as to the Board of Directors may seem to the best interest of the Company." Pack agreed with other directors to undertake the sale of one-half of the bonds, and they assumed a like obligation as to the other half. As there was a short delay in the printing of the bonds Pack advanced the company $40,000.00 on May 1st as a "temporary loan" to satisfy "emergency debts and the payrolls", as he says, taking its note as evidence of the advancement. On May 15th bonds of the par value of $40,000.00 were accepted by Pack in lieu of the note. The other directors failed to sell any of the bonds, and Pack then purchased the balance of the issue (except $1,000.00) and used the proceeds to improve the plant. No bad management is attributable to Pack. But because of the company's inferior coal and a slump in the coal market, it was unable to meet even the interest on the bonds. Its property was sold under the trust deed on July 3, 1925, and purchased by Pack with the bonds he held against it.

The demands of plaintiff arose as follows: In the summer of 1920, J. C. Sullivan, who was then the managing officer of both the plaintiff and the coal company, anticipating a rise in the price of coal, had the coal company ship a quantity of coal to ports in eastern Virginia on consignment to the plaintiff as its agent. The rise in price did not materialize. Before the coal was unloaded, demurrage was charged to the plaintiff by the railroads, which it paid as follows: to the Southern Railway Company, $7,832.00 in October, 1923, and $3,007.00 on April 16, 1924; and to the Virginian Railway Company, $2,210.00 in October, 1923.

The entries on the books of the coal company were made during Sullivan's management.   On January 31, 1924, a check of the coal company for $3,007.00 signed by Sullivan as treasurer was issued to the plaintiff.   Sullivan's connection with the company terminated February 21, 1924.   On April 15, 1924, J. R. Hancock, a director of the company, wrote the plaintiff calling attention to several changes in the management of the company, which had occurred since January of that year, stating that the affairs of the company were disorganized, and requesting plaintiff to recall the check and accept a ninety-day note in its place.   No reply appears to have been made to this letter.   The check was returned to the plaintiff on May 16, 1924, by the bank upon which it was drawn, unpaid, with the explanation of "no funds".

The first demand which plaintiff seems to have made of the coal company for payment of the demurrage was by a letter of June 21, 1924.   Pack says he did not receive that letter. On July 22nd, H. W. McNeil, acting for plaintiff, again wrote the company.   Pack replied on July 24th, stating that he was not as familiar with the claims of the plaintiff as he would like to be, and requested that the matter rest until he could see McNeil and Sullivan.   McNeil had a conference with Pack about the 1st of August, 1924.   Pack then requested that he be furnished a copy of the sales contract between the plaintiff and the coal company.   On August 13, 1924, McNeil informed Pack that no written contract existed and expressed willingness "to go further" into the matter at Pack's earliest convenience.   Whether other conferences were had does not appear, but on October 17, 1924, settlement was requested by plaintiff, which was definitely refused by Pack on November 10, 1924.

This suit was brought in 1926 to recover the demurrage payments.   Pack was impleaded on the theory that the proceeds of the bond issue was a trust fund to pay the plaintiff; that he as a managing officer of the coal company was a trustee of that fund; that he diverted and misapplied the fund to the detriment of the plaintiff, and is therefore personally responsible.   Poca-Pack Coal Company was made defendant

on the theory that as Pack's grantee it also is impressed with that trust. The lower court found in favor of the plaintiff against Pack and the Smith Pocahontas Coal Company.

The only witness as to the shipment of coal and payment of the demurrage is McNeil. He was chief clerk under Sullivan during the joint management of the sales company and the coal company. Appellants say that McNeil's evidence is insufficient, and that there is a presumption against the validity of the demands against the coal company because of plaintiff's failure to use as witnesses Sullivan and J. C. Morrison (who was president of the coal company in 1923).

By reason of his official position, McNeil was fully informed of the affairs of both companies. He made a straight-forward statement of the transaction. He exhibited no prejudice. We perceive no reason to doubt his testimony. It established a *prima facie* case against the coal company, and not being denied, other witnesses were unnecessary.

The fact that Sullivan was manager of both the shipper and the consignee of the coal company is immaterial, no bad faith being shown on his part, and both corporations being fully cognizant of his dual agency. *Lbr. Co.* v. *Terry*, 69 W. Va. 572, 594. The plaintiff, as the agent of the coal company, had the ''incontrovertible'' right to advance the demurrage due by its principal and to be reimbursed therefor. *Flynn* v. *Yeager*, 89 W. Va. 520, 526.

The main question is whether the proceeds of the bond issue may be regarded as a trust fund for the payment of plaintiff's claims. The so-called ''trust fund doctrine'' is traceable in the United States to the celebrated case of *Wood* v. *Dummer*, 3 Mason 308, 30 Fed. Cas. 435, decided in 1824. It was there held that the capital stock of a corporation is a trust fund in favor of corporate creditors. That decision was followed generally by the earlier cases. Some courts even held that the very assets of a corporation were a trust fund for the benefit of creditors. But the Federal Courts have long since receded from the doctrine. In *Hollins* v. *Brierfield Co.*, 150 U. S. 371, 383, it was carefully pointed out that a solvent corporation ''holds its property, as any individual holds his, free from the touch of a creditor who has acquired

no lien''.   Later in *McDonald* v. *Williams*, 174 U. S. 397, 401,
the court said: "When a corporation is solvent, the theory
that its capital is a trust fund upon which there is any lien
for the payment of its debts has in fact very little foundation.
No general creditor has any lien upon the fund under such
circumstances, and the right of the corporation to deal with
its property is absolute so long as it does not violate its
charter or the law applicable to such corporation." In note
(a) page 412, 1 Perry on Trusts, 6th ed., the learned author
concludes that the great weight of authority opposes the
opinion that a trust relation exists between a corporation and
its creditors, and upholds the principle that the rights of
creditors in corporate property "are not essentially different
from the rights of creditors of individuals in the property of
the latter." See the authorities there cited, and Pomeroy.
Eq. Jurisprudence, 2d ed., sec. 2319, which states, "the best
considered of the recent cases represent a complete recession
from the earlier view." The Smith-Pocahontas Coal Com-
pany was solvent when the bonds were issued. Consequently,
we must hold that the assets were subject to no trust at that
time in favor of the plaintiff by reason of the "trust fund
doctrine''.

Was a special trust to pay plaintiff's debt established by
the stockholders' resolution? Specific reference is not made
to that debt. The discharge of all the indebtedness of the
company was not contemplated, but only payment "so far as
necessary''. Therefore, the contention of a special trust in
favor of plaintiff must fail, unless its demands were included
among the debts then *necessary* to be paid. Referring to
the situation existing when he assumed the management of the
company, Pack said: "a good many suits were being threat-.
ened. I would get telegrams and phone calls almost daily
from the time it became known that I was president of the
company." The word "necessary" as used in the resolution
evidently applied to the debts which had become clamorous
and for which suits were threatened. This obvious construc-.
tion is further supported by the uncontradicted evidence of
Pack as to the purpose of the resolution: "There was no
thought in the minds of the stockholders or directors to create'

a' trust fund. The whole spirit of the meeting was to find a way to put the mine on a paying basis." There is no evidence that plaintiff threatened suit or was importunate either before the bonds were issued, or at any time thereafter before the proceeds of the bonds were expended. In fact, plaintiff seemed willing to negotiate with Pack during the entire summer of 1924. There is nothing to show that payment to plaintiff would have tended "to put the mine on a paying basis." On the contrary,. such payment would have materially lessened the funds available for needed improvements. Consequently, we are unable to. classify plaintiff's debt among those "necessary" to be paid under the resolution.

The plaintiff charges that the application to betterments of so much of the bond issue as would have paid its debt, was a diversion of the fund. That contention overlooks the fact that the fund was not provided exclusively or even primarily to discharge indebtedness, and that the resolution expressly authorized the expenditure on betterments of the residue of the issue after paying such debts as were necessary.

Th plaintiff also says that Pack, as the managing official of the coal company, "had no right to prefer and to pay himself out of such trust fund to the exclusion of plaintiff." Had Pack used the bonds to repay himself a debt in existence prior to May 1st, that complaint might be justified, but such is not the case here. Pack described the occurrence in this way: "Immediately after the bond issue was authorized, I had the work started * * * I advanced temporarily to the company while the bonds were being printed, and prior to their receipt, $40,000.00 to take care of emergency debts and the payrolls while this work was going on." Why does he say the money was *advanced?* Why was the advancement *temporary?* It was obviously advanced until such time as the bonds should be delivered. And while Pack himself refers to the advancement as a "loan", the entire transaction shows that it was not a loan, but a pre-payment of the purchase price on the bonds which he afterwards appropriated.

It makes little difference, however, whether we regard the advancement as a pre-payment on the bonds or as a loan

which contemplated the bonds as security. If the latter, equity will treat the advancement and the issuance of the bonds—though fifteen days apart—as contemporaneous in legal effect. *Terhune* v. *Weise*, 132 Wash. 208, 216-17. It is unquestionably lawful for the managing officer of a solvent, or even a failing, corporation to make it a loan and to take security for the loan. The transaction will be given close judicial scrutiny, but if free from fraud will be upheld. *Hope* v. *Salt Co.*, 25 W. Va. 789, point 5 syllabus; Cook on Corporations, 8th ed., sec. 692, page 2765. Pack states that the purposes of the bond issue were fully discussed by the stockholders before it was authorized, that most of the other directors were acquainted with everything he undertook for the company, and that no director ever objected. There is not a scintilla of evidence reflecting on his conduct. No ulterior motive is offered for the advancement. Its express purpose was to discharge certain existing debts, not to create a new one. The assets of the company were not depleted by the transaction. It simply changed the personnel of the company's creditors. "A director of a corporation is not prohibited from lending it moneys when they are needed for its benefit, and the transaction is open and otherwise free from blame; nor is his subsequent purchase of its property at a fair public sale by a trustee, under a deed of trust executed to secure the payment of them, invalid." *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587; 7 R. C. L., p. 755, sec. 771; 14a C. J., p. 188, sec. 1968; annotation 19 A. L. R., p. 380. *Reid* v. *Perrow*, 136 Va. 449, strongly urged by plaintiff is not only "contrary to the prevailing view" (see note 38 A. L. R., p. 94), but is based on facts different from those presented here.

The trust deed executed by the coal company to secure the bond issue provided that until in default, etc., the company should remain in possession of, and operate and receive the proceeds from, the mortgaged property. The plaintiff contends that under *Gilbert* v. *Peppers*, 65 W. Va. 365, and cases cited in the opinion, the conveyance is fraudulent *per se* and void as to creditors in so far as it affects the stock of merchandise then owned by the coal company, and that the

plaintiff may follow and impress its claims upon that stock now in the possession of the Poca-Pack Coal Company. "Whether a deed of trust or mortgage is fraudulent on its face, does not depend upon technical grounds. The question is governed by practical consideration and elements." *Acadian Lbr. Co.* v. *Brooks Lbr. Co.*, 88 W. Va. 595, 604. The only purpose of the trust deed, as disclosed by the record, was to procure money to pay off the pressing indebtedness of the coal company and to improve the plant. The value of the merchandise at the date of the conveyance was estimated at $6,000.00—a sum too small in proportion to the value of the entire subject of the trust, to suggest an ulterior motive. The company had no way to earn money for the satisfaction of the bond issue except through its mining business. The evidence shows that the store furnished needful supplies to the employees, and that operation of the mine without the store was impracticable. The maintenance of the store was therefore a natural incident of the attempt to continue mining. Instead of being inconsistent with or defeating the trust (the test under the leading cases; see *Kuhn Netter & Co.* v. *Mack*, 4 W. Va. 186, 194), the operation of the store supported the trust.

In *Cochran* v. *Paris*, 11 Gratt. 348, 355, the Supreme Court of Virginia refused to hold a trust deed of real estate fraudulent as to creditors, because it conveyed growing crops, and was not to be enforced until two years from its date, saying: "The deed may embrace other property, to the improvement, support or sustenance of which, such perishable property is essential; and in such last supposed case the fact that the perishable property is embraced in the deed, so far from being indicative of a fraudulent purpose, might rather serve to show an honest and a provident design and effort to make the main subjects of the trust a more certain and productive security." In *Bartles & Dillon* v. *Dodd*, 56 W. Va. 383, 388, this Court refused to hold as fraudulent a deed of trust conveying hotel property, merely because it also included a small amount of "eatables and drinkables", for the following reasons: "The plain object of the deed, while not permitting the debtor to defeat it, was to permit him to proceed with

the hotel business, and presumably, to make the money to pay off his indebtedness. * * * In carrying on this business, it would be necessary for him to use up the eatables and drinkables on hand, and continually to purchase others to supply the place of those used. Otherwise all the other property would be valueless to him. * * * The plain object of these provisions was not to hinder, delay and defraud creditors, but was to keep the security good. The amount thereof being small in comparison with the residue of the property, and the object of including it in the deed being apparent does not render the deed fraudulent on its face.'' Again in *Acadian Lumber Company* v. *Brooks Co., supra,* a trust deed of standing timber, saw-mill, lumber, etc., was held valid as to the lumber despite a provision that the grantor could proceed with the manufacture and sale of the lumber. The decision is sound, but its weight as a precedent in this case is impaired by an ineffectual attempt in the opinion to differentiate it from *Gilbert* v. *Peppers,* etc., on the ground that the lumber ''was not of a transitory nature. It was radically different from a stock of goods in a store.'' We see no difference in legal effect between lumber which is being continually manufactured and sold and a stock of merchandise which is being continually replenished and sold. ''The tendency of courts in modern times has been not to hold instruments of this character to be fraudulent on their face, unless they contain provisions plainly inconsistent with an honest purpose, or the instrument indicates with reasonable certainty that it was executed, not to secure *bona fide* creditors, but to enable the debtor to continue to carry on his business under cover or another's name.'' *Huntly* v. *Kingman,* 152 U. S. 527, 532. The *bona fides* of the trust deed as security for the bonds is beyond question. Refrainment from charging a preference of creditors under section 2, chapter 74, Code, and from instituting this suit until after the effort to continue the operation of the mine had proven a failure, strongly indicates that the plaintiff saw nothing improper or unwise in the provisions of the instrument. We see no difference here in principle from the situations existing in *Cochran* v. *Paris, supra,* and

*Bartles & Dillon* v. *Dodd, supra,* the latter of which cases was expressly excluded from the rule in *Gilbert* v. *Peppers.* See, also *Brewing Company* v. *Henaghen,* 73 W. Va. 682, 684.

The rule that equity will retain jurisdiction, once assumed, and dispose of all matters in litigation, is limited to cases where that jurisdiction has been rightfully invoked. While equity extends its aid upon mere averment, it withdraws that aid upon failure of proof. The plaintiff has not established a single allegation upon which equity jurisdiction was assumed. The fact that the evidence shows *prima facie* a legal demand in its favor against Smith Pocahontas Coal Company for the demurrage paid, will not justify a court of chancery in entering a decree on that demand. "The rule is that where a cause of action cognizable at law is entertained in equity on the ground of some equitable relief sought by the bill, which it turns out cannot for defect of proof or other reason, be granted, the court is without jurisdiction to proceed further and should dismiss the bill without prejudice." *McDowell* v. *Mitchell,* 105 U. S. 430, 432. *Mfg. Co.* v. *Kelley,* 84 W. Va. 190, 197-8; *Hawes* v. *Dobbs,* 18 N. Y. S. 123; *Brauer* v. *Laughlin,* 235 Ill. 265; *Robinson* v. *Campbell,* 222 Mich. 111; *Oregon Growers, etc.* v. *Riddle,* 116 Ore. 562; *Davis* v. *Society,* 93 Vt. 520; 10 R. C. L., p. 372, section 121; 21 C. J., p. 142, section 123.

The decree of the lower court will accordingly be reversed and the plaintiff's bill dismissed without prejudice as to Smith Pocahontas Coal Company.

> *Decree reversed; bill dismissed without prejudice as to the named defendant.*