460

In re EAKIN LUMBER CO.
No. 3524–C.

District Court, N. D. West Virginia.
Aug. 16, 1940.

by the referee on July 18, 1940. It is said the referee erred (1) in ordering the estate to surrender a saw mill and other equipment to Gauley Coal Land Company and (2) in adjudicating claims of Gauley Coal Land Company for $8,785 and $609.25, respectively, as first in priority (and ahead of the claim of Reconstruction Finance Corporation) upon the funds derived from the sale of certain lumber.

By deed dated July 20, 1926, Gauley conveyed to the bankrupt standing timber on a tract of 11,127.4 acres in Nicholas County, West Virginia, for a consideration of $100,-000, all of which has been fully paid and of which $7,720.25 was paid from funds arising from a loan made by Reconstruction Finance Corporation to bankrupt on November 20, 1935. This deed also granted the right to construct railroads, roads, bridges, and all necessary improvements, mills, buildings and machinery "for the purpose of hauling and loading logs and timber and manufacturing the same into lumber and removing lumber, timber and timber products" from such land and other lands "the timber upon which is now owned or which may be acquired" by bankrupt within the period of such contract; provided that after any part of the area therein conveyed has once been cut over, it should not be cut over again, and after the party of the second part shall have once completed the cutting of timber, "all the rights of the party of the second part shall be at an end, except, however, its rights of way and other rights for the removal of timber and timber products from other lands covered hereby or other timber owned by the party of the second part".

It then provides:

"The party of the second part shall have the right during the continuance hereof to remove any and all of the mills, buildings, machinery, railroad and other improvements and structures, placed, built and erected on the lands covered hereby at any time within the period hereof".

"It is agreed between the parties hereto that all of the rights of the party of the second part hereunder shall cease and determine in fifteen (15) years from the date hereof and that any timber which the party of the second part has the right to cut which it shall fail to cut and remove during the said period of fifteen (15) years shall revert to and become the property of the party of the first part".

H. L. Snyder, of Charleston, W. Va., and Stuart G. Christian, of Richmond, Va., for Reconstruction Finance Corporation.

A. N. Breckinridge, of Summersville, W. Va., for Gauley Coal Land Co.

HARRY E. WATKINS, District Judge.

Eakin Lumber Company was adjudicated a bankrupt on April 6, 1939. Reconstruction Finance Corporation, the largest creditor, has asked for a review of an order entered

This tract was evidently not so suitable for the location of a mill and other buildings incident to the manufacture of the timber because ten days later, July 30, 1926, the bankrupt leased another tract for this purpose. Such lease gave the bankrupt the right to construct, maintain and operate a single track railroad and the right to "locate, construct, maintain and operate * * * buildings, lumber yards, tracks, * * * and other buildings * * * for use in its operations of removal, manufacture, storage, sale and transportation of logs, lumber and other timber products under the timber sale indenture of July 20, 1926" at any time and for the period therein named and provided. All the rights given were "limited to the period of operations under the said timber sale indenture" (July 20, 1926). It then provided: "It is understood and agreed, however, that Eakin Lumber Company shall have six months after the expiration of its rights under the timber sale indenture" (the deed of July 20, 1926) "whether by the expiration of the period therein named or by the completion of its operations thereunder, to remove and take away all machinery, plant and buildings made, constructed and placed by it on the lands of Gauley Coal Land Company and all buildings, plant and structures not removed within the said period of six months shall be and become the property of Gauley Coal Land Company".

Pursuant to these agreements the bankrupt erected a mill and other improvements, appraised at $25,000, upon the property described in the latter agreement, none of which have yet been removed.

■ The referee found that bankrupt had completed its cutting of timber on or about April 1, 1938, and since the mill and other structures and equipment had not been removed within six months thereafter, they "reverted" to Gauley. The referee found that the right of the bankrupt to operate its mill was limited to a period of fifteen years "unless sooner terminated by removal of timber". I do not agree with this construction of these contracts. Such finding by the referee, in my opinion, is clearly erroneous. The bankrupt is given the right to occupy the land and conduct its operations until "the expiration of the period herein named or by the completion of its operations thereunder"—not until the completion of the cutting or removal of timber as found by the referee. Its operations are not limited to the cutting or removal of this particular timber. The deed contains the right to manufacture this lumber as well as lumber from other lands owned or acquired by the bankrupt within the period of the contract. The period named was fifteen years from July 20, 1926, or until July 20, 1941. Six additional months, or until January 20, 1942, was given in which to remove all property.

This construction of the contract makes it unnecessary to decide whether the cutting of timber has been completed. There is some conflict in the evidence on this point. Suffice it to say that bankrupt was continuing its operations by the manufacture of lumber down to the date of bankruptcy. There is no evidence in the record that the bankrupt intended or that Gauley had taken any action to forfeit the mill machinery and equipment prior to bankruptcy.

■ Forfeitures are not favored by the courts and will not be declared or enforced unless justice clearly demands it. Hill v. Vencill, 90 W.Va. 136, 111 S.E. 478; Pyle v. Henderson, 65 W.Va. 39, 63 S.E. 762. No material benefit has been lost to Gauley. It has been paid $100,000 by bankrupt in full payment for its timber, and a fifteen year period for timber cutting and lumber manufacturing upon its property. It would seem that the creditors of the estate should be entitled to any benefit which can be derived from the mill and equipment during the unexpired portion of the lease. The estate has lumber worth more than $65,000 stacked near the mill for sale. Whether or not the purchaser will be able to purchase the use of the mill and equipment for a limited time will materially affect the sale price of the lumber. The petition to surrender the mill and other equipment should be denied.

In considering the second error assigned as to whether Gauley's claims are of higher priority than the claims of Reconstruction Finance Corporation, hereinafter referred to as pledgee, a further statement of the facts is necessary. On November 20, 1935, pledgee loaned bankrupt $150,000, taking a deed of trust upon its property to secure the debt. Realizing that a deed of trust lien would be invalid as to a moving stock of manufactured lumber, it attempted to accomplish the same result by a so-called "lease, agreement and pledge". This agreement of November 20, 1935, leased to pledgee the lumber yard at Fenwick which the bankrupt had leased from Gauley by its agreement of July 30, 1926, mentioned above. It also provided that bankrupt

pledged as security for the loan "all of the lumber now stored and any and all lumber which hereafter may be placed upon said leased tracts of land hereinbefore described". The bankrupt was continuously selling lumber from the yard, purchasing new timber, and then cutting and manufacturing it into lumber. The pledge contemplated a lien not only on existing lumber in the yard but on lumber to later come into existence. By the agreement O. S. Travis was granted exclusive custody and possession of the lumber as agent of pledgee. A fence was placed about the yard, except at two ends where a railroad track went through, and signs were placed on the fence stating that the land was leased and the lumber thereon pledged to the pledgee. The evidence shows that the agent, while giving his consent in writing, as contemplated by the agreement, in fact permitted the bankrupt to sell lumber from the yard at will, sometimes by substituting other lumber, sometimes by not substituting anything. Travis was paid by bankrupt.

On October 1, 1937, Gauley conveyed to bankrupt the timber on a tract of 2,279 acres for the sum of $16,000, of which $4,000 was paid in cash, balance to be paid in monthly installments. The balance due upon this timber at date of bankruptcy was $8,785.

By deed dated July 20, 1936, Gauley conveyed to one A. J. Strader the timber on a tract of 180 acres for $815 of which $50 was paid in cash, balance to be paid in equal monthly installments. Strader subsequently sold this tract to bankrupt which assumed the deferred payments. At the time of bankruptcy the balance due upon the purchase price was $609.25.

A vendor's lien was retained in each deed to secure the deferred purchase money. Neither deed was recorded. Both deeds gave the usual cutting and removal privileges except they provided that "no greater part of the timber herein sold shall be removed from the land at any time than the proportion of the price actually paid bears to the total purchase price". On April 11, 1938, bankrupt was in default with its payments upon the larger tract, and by taking advantage of certain concessions as to payments, agreed that "not more than 50% of the timber paid for at any given time will be removed from the property".

In April, 1938, bankrupt began to cut and remove much more of this timber than it was permitted to remove by its contract. There is no evidence that Gauley knew that bankrupt was violating its agreement in removing the timber, or that it had any actual knowledge of what was being done at the timber yard. Gauley denies such knowledge. The logs were transported about fourteen miles to the mill on the Gauley property where they were manufactured into lumber and the lumber stored on the lumber yard on the Gauley property which had been leased to bankrupt. This cutting continued until the mill shut down just prior to bankruptcy. At the time of sale the large tract contained 5,221,400 feet of timber. All except about 1,500,000 feet was cut and manufactured between April, 1938 and the date of bankruptcy. All the timber was cut and manufactured from the smaller tract. There is evidence to the effect that at least 1,500,000 feet of the lumber now in the yard came from the large tract. Other lumber from other tracts was also stored there in the same manner. P. E. Eakin, president of the bankrupt company, estimates that forty per cent, or thereabouts, of the lumber now stacked at the yard on property owned by Gauley was manufactured from timber taken from Gauley's property.

Under these facts Gauley claims a vendor's lien and a common law seller's lien upon the manufactured lumber in the yard. The Reconstruction Finance Corporation says that Gauley lost its lien when the timber was cut and removed to the lumber yard leased by it; and that it has the first lien upon the lumber by reason of its lease and pledge agreement of November, 1935. It does not claim a lien by reason of its deed of trust. It is admitted that Gauley has a vendor's lien upon all the standing timber remaining on its land, but it seems that such timber is insufficient to secure the balance due, since less than one-half of the purchase price has been paid.

As a general proposition the vendor of standing timber to be cut and removed from his land by the vendee has a common law lien, known as the seller's lien, on the timber and the lumber manufactured as long as it remains upon his premises, unless it is otherwise stipulated in the contract. Acadian Coal & Lumber Co. v. Brooks Run Lumber Company, 88 W.Va. 595, 107 S.E. 422, 427; Curtin v. Isaacsen, 36 W.Va. 391, 15 S.E. 171. While the lumber remains on the vendor's premises it is deemed to be within his possession, notwithstanding the cutting and manufacture thereof by the vendee, and his limited control of the

premises. Justice v. Moore, 69 W.Va. 51, 55, 71 S.E. 204, Ann.Cas.1912D, 17; Curtin v. Isaacsen, supra. Release of the seller's lien as to part of the property, by relinquishment of possession thereof without payment, does not destroy nor impair it as to the property still held. Justice v. Moore, supra. Such a lien is superior to all subsequent liens created by deed of trust or pledge. Acadian Coal & Lumber Company v. Brooks Run Lumber Company, supra. Constructive delivery to the purchaser, such as a delivery to him on the lands of the grantor, will not divest the seller of his lien. And such seller's lien is a thing distinct from the title. The purchaser may have title and still not have right of possession. Justice v. Moore, supra. Possession of the vendor may be actual or constructive. Constructive possession in the vendor exists in cases where there is a provision in the deed that the timber is not to be cut and removed until payment is made. In Buskirk Bros. v. Peck, 57 W.Va. 360, 50 S.E. 432, 436, no vendor's lien was retained, but the contract provided that the timber should be cut and hauled to the measuring place and not removed until fully paid for. In discussing this non-removal clause, the court said: "But for the nonremoval clause, the vendor would have no lien. He inserted it from necessity for the very purpose of reserving a lien. Jones on Liens, § 822. By it he holds a sort of constructive possession sufficient to support a lien for his purchase money".

Very similar to the instant case is that of Wiggin v. Mankin, 65 W.Va. 219, 63 S.E. 1091, 1092, where there was no vendor's lien retained but there was a provision against removal of a part of the lumber until payment. The court said: "Although a seller may sever timber located on his land and deliver it at a mill of purchaser located thereon, pursuant to contract, but because of the nonremoval provision thereof, only constructively delivering the same to the purchaser, and thereby to execute the contract, and to pass the title thereto, yet so long as the seller remains in constructive possession of the lumber so retained on his land, and has not abandoned the same, his seller's lien for balance of purchase money continues valid and binding, as against such subsequent purchaser from, or creditors of, his vendee". The court reached this conclusion even though Wiggin claimed that, as his contract was recorded and the vendee's was not, he was entitled to the lumber as an innocent purchaser for value. There, too, the innocent purchaser claimed that he had no knowledge of any secret equities contained in the unrecorded contract. There, too, there was an attempted lease to Wiggin of a parcel of land upon which logs and lumber should be piled, for the purpose of giving Wiggin, alleged innocent purchaser, possession of the logs and lumber as delivered and stacked. The West Virginia Supreme Court stated: "The claims of Wiggin in relation thereto, we think, are fully answered by prior decisions of this court. The lien claimed by Mankin is under that clause of his contract prohibiting removal from the land before payment. Such lien, as was said by this court in Buskirk Bros. v. Peck, 57 W.Va. 360, 370, 50 S.E. 432, 435, 'is well known to the law as the seller's lien for purchase money,' and, as is there held, although retention of the possession of the property until payment is essential to its existence, yet possession may be constructive or actual, and where goods are sold, counted out, and set apart for the purchaser, but not actually delivered into his possession, the title passes, and there is constructive delivery sufficient to execute the contract, yet the seller had a lien for the purchase money".

Here the pledgee relies largely upon Williams v. Gillespie, 30 W.Va. 586, 5 S.E. 210. But as intimated by brief of pledgee, that case has not been followed by subsequent West Virginia cases cited above. Furthermore, in that case there was neither a vendor's lien nor a non-removal clause in the contract of sale. Referring to that case in Wiggin v. Mankin, supra, the court said: "In that case the contract contained no provision for retention of the property, subsequently pledged by oral agreement, as security for the unpaid purchase money".

What right did the bankrupt have to lease Gauley's mill and lumber yard? The only right it had was covered by the agreement of July 30, 1926. The bankrupt acquired no right not covered by that contract. It held under that contract and was bound to know what it contained. This agreement gave bankrupt the right to use the mill and lumber yard only "in its operations of removal, manufacture, storage, sale and transportation of logs, lumber and other timber products under the said timber sale indenture of July 20, 1926", * * * for the "period of operations under the said timber sale indenture". It did not give the right to use the mill and lumber yard for

manufacture and storage of lumber from other tracts. The pledgee had at least constructive notice of the limited rights of the bankrupt because the agreement of July 30 was recorded many years before the sublease and pledge were made. This construction of the lease is borne out by the terms of the two subsequent deeds between the two parties, dated July 20, 1936, and October 1, 1937, in which provision is made for manufacture and storage of lumber on the tracts where the lumber stood. It is true that the record does not disclose any objection on the part of Gauley to the use of the mill and lumber yard at Fenwick in manufacturing and storing lumber from these tracts but this could not give the bankrupt any right to sub-lease that which was not granted in its own lease. The lumber stored on Gauley's property at the date of bankruptcy did not come from the timber sold under indenture of July 20, 1926. It all came from other lands.

 In my opinion it would make no difference in the result reached even though the terms of the agreement of July 30 had been broad enough to give bankrupt right of manufacture and storage of lumber from other tracts. In such event the rights of the pledgee would be no greater than those of the pledgor under its contract. The pledgor may have had title but it did not have right to possession, and therefore could not confer it upon pledgee, otherwise than subject to the precedent condition—that of payment of the purchase money before removal. Justice v. Moore, supra. In the Justice case there was no vendor's lien but the following clause [69 W.Va. 51, 71 S.E. 205, Ann.Cas. 1912D, 17]: "The said timber to stand good for the purchase money and expense". The court said: "This clause could have been intended to secure to the seller a lien in addition to that given by the common law, one continuing after removal from the premises, and may have been inserted in the contract for this purpose".

Here there was both a vendor's lien and a nonremoval clause in both Gauley deeds, made long after the pledge agreement. Had the lumber been cut, manufactured and stored on these respective tracts, it would certainly not be contended that any such lease and pledge agreement could operate to defeat the seller's lien. I cannot see that removal of the timber to other land of the seller for only manufacture and storage purposes can change the result. In either event the manufactured lumber remained in the constructive possession of the seller, and subject to seller's common law lien for the purchase price. As to Gauley, the pledgee is not a purchaser for value without notice. In Spies v. Butts, 59 W.Va. 385, 53 S.E. 897, 906, the purchaser was severing the timber without payment and there the court said: "If defendants' contention is correct, they could, if they chose, sever all the timber on the land and convert it into personal property, of which they would be the absolute owners, and so deprive the plaintiff of his lien or right to look to the timber so severed for his purchase money, and they could transfer their interest or good title in or to the same to an innocent purchaser without notice of their fraud, thus depriving the plaintiff of any remedy as against the timber".

 It is said that the lien is extinguished because the seller failed to identify the lumber from its lands; that the pledgee has the prior lien and the burden is upon Gauley, the subsequent lienor to identify its property. With this argument I cannot agree. Gauley had the prior lien and it is no fault of Gauley that its lumber was co-mingled by a subsequent lienor. The burden is upon the pledgee to show what part of the lumber is not covered by the seller's lien, and this it has failed to do. The evidence shows that there were fifty-two stacks of lumber upon the portion of the yard owned by Gauley, but that only thirty-eight of these stacks were put there during the time that timber was being cut from tracts upon which Gauley held a lien. Consequently, I am of opinion that Gauley is entitled to a lien first in priority ahead of Reconstruction Finance Corporation upon these thirty-eight stacks of lumber, or the proceeds thereof, for the unpaid purchase money due it as shown by its claims. Weaver v. R. L. Neal & Co., 61 W.Va. 57, 55 S.E. 909, 123 Am.St.Rep. 972; 11 A.J. 527.

The order of the referee is therefore affirmed in part, and reversed in part.