## In re EAKIN LUMBER CO.

No. 3524–C.

District Court, N. D. West Virginia.

June 30, 1941.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

H. L. Snyder, of Charleston, W. Va., and Stuart G. Christian, of Richmond, Va., for Reconstruction Finance Corporation.

Herbert M. Blair, of Weston, W. Va. (James H. Brewster, Jr., of Weston, W. Va., on the brief), for Sun Lumber Co.

O. C. Lewis, of Summersville, W. Va., for A. J. Williams and other wage claimants.

HARRY E. WATKINS, District Judge.

This is the second appeal·in this case involving the priority of liens upon the proceeds of sale of manufactured lumber in the bankruptcy proceedings of Eakin Lumber Company. See 34 F.Supp. 460. The referee has fixed the Reconstruction Finance Corporation pledge lien first in priority. A. J. Williams and other wage lienors, as well as Sun Lumber Company, the holder of a vendor's lien and deed of trust lien, have asked that the referee's order be reviewed.

The Sun Lumber Company lien will first be discussed. By deed dated March 19, 1924, Blue Creek Coal and Land Company conveyed to J. H. Brewster and G. P. Gillespie 1,140 acres of timber (less about 100 acres reserved) at Sanderson, on Blue Creek, in Kanawha County, West Virginia, together with the right of removal within a period of ten years. It also granted "the right to the use of certain bottom land on the northerly side of Blue Creek of the lands of the party of the first part at the mouth of Board Tree Hollow for a mill site for the location and operation of a saw mill and lumber yard thereon during the term of this agreement for the manufacture and removal of said timber, * * *". By deed dated September 19, 1924, the same seller conveyed to the same buyers other timber tracts of 300 acres and 2,250 acres on Blue Creek, with removal and operating rights. By deed dated October 6, 1925, Brewster and Gillespie conveyed all their rights under these two deeds to Moon Lumber Company, which, on September 2, 1928, conveyed all such rights to bankrupt for a consideration of $110,010. A vendor's lien was retained to secure the unpaid purchase money, of which $21,047.-37 still remains unpaid, the notes representing same now being owned by Sun. On April 2, 1928, Sun loaned bankrupt the further sum of $50,000, taking a deed of trust on these three lumber properties, and other property to secure the loan, none of which has been repaid. On March 30,

1929, none of the timber had been removed, and on that date Blue Creek and bankrupt signed an agreement extending the period for removal of timber under deeds of March 19, 1924, and September 19, 1924, for five more years. By similar agreement this period was again extended on October 1, 1935, for three more years.

On November 30, 1935, bankrupt borrowed $150,000 from R. F. C., giving a deed of trust upon all of its tangible properties, including the Kanawha County timber tracts purchased from Moon, together with all rights, powers and privileges granted to Brewster and Gillespie by the deeds to them from Blue Creek, dated March 19, 1924, and September 19, 1924, and also by subsequent extensions of such two deeds.

The R. F. C. also took "stand-by agreements" signed by former lien creditors, whereby Sun and the wage claimants agreed to withhold proceedings for the collection of their lien debts, until the R. F. C. was repaid, unless bankruptcy should intervene, in which event lien creditors should be restored to all their original remedial rights in respect to their debts. The stand-by agreements did not attempt to subordinate the existing lien creditors to the R. F. C. deed of trust lien, but only gave assurance that none of such lien creditors would attempt to enforce their lien claims and thereby cause the debtor to go into bankruptcy. The agreement provided for the payment by the debtor of $5 out of the sale price of each 1,000 feet of timber sold from the Kanawha County tracts to lien creditors, of which $3.50 was to be applied to vendor's lien debt and $1.50 to the R. F. C. debt.

Realizing that a deed of trust lien would be ineffective as to a moving stock of manufactured lumber, the R. F. C. attempted to secure a lien upon such moving stock at the Fenwick and Summersville lumber yards by a so-called "lease, agreement and pledge". This agreement of November 20, 1935, covered the lumber yards at Fenwick and Summersville, and provided for the pledge of at least 5,000,000 feet of lumber to secure the R. F. C. debt. Later the lumber at Summersville was released from the pledge and delivered to the borrower for marketing and a new lease and pledge agreement dated January 4, 1937, was signed by bankrupt whereby a substantially equal amount of lumber was pledged at the Sanderson lumber yard, in Kanawha County. This pledge covered lumber manufactured from the tracts on which Sun held its vendor's lien. Sun denied that it knew anything about this substituted pledge until after bankruptcy. Such agreement leased to R. F. C. the lumber yard at Sanderson. It pledged as security for the R. F. C. loan "all of the lumber now stored and any and all lumber which hereafter may be placed upon said leased tract of land hereinbefore described". All lumber placed on the Sanderson yard came from the three tracts covered by the Sun vendor's lien. The bankrupt was continually selling lumber from the yard, and replacing it with new. By the agreement O. S. Travis was granted exclusive custody and possession of the lumber as agent of the pledgee. A fence was partially placed about the yard, and signs were placed on the fence stating that the land was leased and the lumber thereon pledged to R. F. C.

On April 6, 1939, Eakin Lumber Company filed a voluntary petition in bankruptcy and was adjudicated a bankrupt the same day. The lumber stored in the yard at Sanderson on the date of bankruptcy has been sold in this proceeding for $27,915.36 and the lumber in the yard at Fenwick has been sold by the trustee for $59,473.74. On January 6, 1941, the referee allowed the R. F. C. a first lien upon the proceeds from the sale of the Sanderson lumber by reason of its pledge agreement. He held that Sun had neither a seller's lien nor vendor's lien upon the manufactured lumber at Sanderson.

 In my opinion, Sun Lumber Company has both a vendor's lien and common-law seller's lien first in priority upon the proceeds of such lumber at Sanderson. As a general proposition the vendor of standing timber to be cut and removed from his land by the vendee has a common-law lien, known as the seller's lien, on the timber and lumber manufactured as long as it remains upon his premises, unless it is otherwise stipulated in the contract. Acadian Coal & Lumber Co. v. Brooks Run Lumber Co., 88 W.Va. 595, 107 S.E. 422, 427; Curtin v. Isaacson, 36 W.Va. 391, 15 S.E. 171. See, also, cases cited in Re Eakin Lumber Co., D.C., 34 F.Supp. 460.

In Acadian Coal & Lumber Co. v. Brooks Run Lumber Co., supra [88 W.Va. 595, 107 S.E. 424], the vendor's lien was

expressly limited to "the timber cut by the party of the second part and lumber manufactured therefrom while on the premises". The timber was taken off the tract from which it was severed, for sawing and storage. Judge Poffenbarger, speaking for the Supreme Court of West Virginia, said: "The lien must be created by express contract. It cannot arise by implication. Hence it cannot extend beyond the terms of the contract in any respect. Timber and lumber not on the premises, or that has been removed from the premises, is not included. The word 'premises,' however, does not necessarily mean the 1,430-acre tract of land. It means all of the grounds or tracts of land on which the lumber operations are conducted. * * * It is not unusual for the mill and lumber yards of such an operation as is described in the deed to be located on a lot or parcel of land near to or adjoining the tract from which the timber is taken for manufacture. It would be unreasonable to suppose all of the lumber manufactured from timber on a tract of land is to be either sawed or stacked on the land from which it is taken. A practical man would say 'premises' as used here refers to the mill site and yards, whether on the granted land or not, as well as the land from which the timber is cut, and the term is to be taken in the sense in which a practical man would employ it. The mill site and lumber yards were shown, by extrinsic evidence, to be in this case on a 56-acre tract of land owned by the grantors, and not included in the 1,430-acre tract. Our conclusion is that the lien extended to timber cut and lumber manufactured while at the mill and on the lumber yard awaiting transportation in some way."

■ Here the evidence is not clear as to whether the lumber yard was actually within the 1,140-acre timber tract conveyed. The referee found that it was without the tract and that the seller lost his lien when the logs were removed for manufacture and storage. In my opinion, the seller retained his lien, even though the lumber yard was not within the 1,140-acre boundary. When Blue Creek sold this 1,140-acre tract of timber, it granted the right to use sufficient bottom land on the northerly side of the creek just across the creek from the 1,140-acre tract, for the location and operation of a saw mill and lumber yard. The evidence shows clearly that the Sanderson saw mill and lumber yard in question was placed upon this exact location. There was no other location suitable for such purposes. The right to use this bottom land for such purposes was included in all subsequent deeds, including the deed in which the vendor's lien in question was retained. It is true that on September 19, 1929, bankrupt leased six acres of this bottom land, including the ground where the lumber yard was located from Blue Creek. This lease is explained by the fact that there were then twelve dwelling houses on this parcel, which lessee agreed to use for dwelling purposes only. The lumber has, therefore, never been off that part of the premises of Blue Creek on which its grantees, Brewster and Gillespie, and their grantees, had the right to carry on their lumber operations. While on such premises, the lumber is still in such possession of the seller as to retain his lien for the purchase price.

■ The argument was advanced by the R. F. C. for the first time before me that Sun is only a general creditor; that any vendor's lien which it might have had, ended in 1934 upon expiration of the ten year period for removal of the timber. Such was not the position taken by the R. F. C. in 1935 when it made its loan, because in all the papers the claim of the Sun is treated as a valid and subsisting vendor's lien. It is clear that the original ten year period for removal of timber was extended by the subsequent contracts. In fact, the extension agreements provide that the original contracts for sale of the timber are to remain in full force and effect, except as to the period for removal of timber, which was thereby extended.

■ It is contended by Sun that the R. F. C. was guilty of some degree of fraud in the manner in which it took a pledge of the lumber at Sanderson. The conclusion heretofore expressed makes it unnecessary to decide this question. However, I find nothing in the record to sustain any such charges. Both oral and documentary evidence shows that R. F. C. was loaning a large amount of money, and was attempting to secure the repayment of the loan as best they could without impairing existing liens, including the liens of Sun. This is indicated by the terms of a resolution adopted by the executive committee of R. F. C. on the 9th day of September, 1935, approving the loan and reciting the terms and condition thereof. In that resolution

it is stated that "as to said Sanderson tract the lien of the mortgage may be subordinate to prior liens of an aggregate principal amount not in excess of $91,250." This exact amount is reached by adding the existing lien claims, including the lien claims of Sun, as enumerated in that resolution. Likewise, the stand-by agreements prepared and executed at the request of the R. F. C. show a clear intent, not only to recognize all existing liens, and their priority, but to partly provide for their payment out of lumber sold. The creditors were likewise interested in keeping the debtor going, and were willing to agree to do nothing toward enforcing their claims which might result in bankruptcy. They kept this agreement. Should bankruptcy result, the agreements permitted their claims to be proved and allowed in proper priority. The agreement of R. F. C. to occupy a subordinate position with respect to the Sanderson timber and lumber was certainly one of the chief inducements to Sun to sign the stand-by agreement. The manifest purpose of the pledge and lease agreement was to protect the R. F. C. against future acquired liens on manufactured lumber, and not to devise a scheme to prejudice the rights of existing lien creditors.

The R. F. C. resolution of August 9, 1935 (section I–D–6) recognized a charge on the manufactured lumber at Sanderson for payment to the creditors having prior liens. After listing the vendor's lien and deed of trust creditors (including the Sun deed of trust claim), aggregating $91,250, the resolution provided that $3.50 should be paid out of each 1000 feet of manufactured lumber sold from the Sanderson tract by borrower, to such lien creditors until their claims were paid in full. After the special custodian assumed charge at Sanderson, 8,650,102 feet of lumber passed from the Sanderson mill yard. From the sale proceeds thereof Sun should have received $30,275.36. Out of 1,997,775 feet of lumber on the Sanderson yard at date of bankruptcy, Sun was entitled to the full security of its vendor's lien, because none of this lumber had been sold prior to bankruptcy.

The second question involves the priority of certain statutory wage liens upon the manufactured lumber at Sanderson and Fenwick. The referee allowed labor liens for amounts not exceeding $600, whether or not performed within three months, under Sec. 64, sub. a (2) of the Chandler Act, 11

U.S.C.A. § 104, sub. a (2), and placed such labor liens second in priority to the pledge lien of the R. F. C. No claim is made by R. F. C. to lien upon the manufactured lumber by reason of its deed of trust. The laborers assert a lien for the full amount of their wages ahead of the R. F. C. pledge lien, by virtue of a West Virginia statute which then gave a lien to laborers when work was performed for a corporation, without any limitation as to amount. W. Va.Code, Ch. 38, Art. 2, Sec. 31. That statute reads as follows: "Every workman, laborer or other person who shall do or perform any work or labor, for any incorporated company doing business in this State, by virtue of a contract either directly with such incorporated company or with its general contractor or with any subcontractor, shall have a lien for the value of such work or labor upon all real estate and personal property of such company, and such lien shall have priority over any lien created by deed or otherwise on such real estate or personal property, subsequent to the time when such labor was performed."

Section 32 provides that such lien shall be discharged unless the person desiring to avail himself thereof, within ninety days from the time he shall have ceased to work, shall file with the clerk of the county court of the county in which such work was performed, or in which the principal office, works, real estate or personal property of such incorporated company is situated, a notice of lien containing the amount due him after allowing all credits, which notice shall be sworn to by the person claiming such lien, or by someone in his behalf. Such notice was given by each of these wage earner petitioners.

These petitioners, fifteen in number, may be placed in three different classifications for the purpose of this discussion, as follows:

1. Wages aggregating $7,235.85 earned prior to November 20, 1935, the time the R. F. C. loan was made, when a so-called "stand-by" agreement was signed by such claimants.

2. Wages aggregating $3,612.35 earned between the date the R. F. C. loan was made and January 6, 1939. (This date is three months prior to April 6, 1939, when this voluntary petition in bankruptcy was filed).

3. Wages aggregating $1,059.58 earned within three months prior to bankruptcy.

When the R. F. C. made its loan it required the unpaid wage earners to sign a stand-by agreement, similar to the stand-by agreement signed by Sun and other prior lien creditors. This agreement provided that the wage claimants would not sue upon their claims or do anything else to collect which might bring about liquidation. Like the Sun agreement, it made no attempt to subordinate the wage liens to the R. F. C. claim. It specifically provided that in the event of bankruptcy, the wage lienors (upon certain conditions which have been fully performed) might assert and enforce any of their claims, notwithstanding such stand-by agreement. Therefore, it is my opinion that such stand-by agreements do not affect the rights of such lienors in this proceeding.

Counsel agree that the Chandler Act, in effect when this bankruptcy occurred, is the applicable statute to be applied in determining the rights of parties. Remington, 4th Ed., Sec. 2779. Neither is it questioned that the labor liens have been perfected under the West Virginia law so as to be valid statutory liens.

Sec. 64, sub. a of the Chandler Act, provides, in part, as follows: "Debts which have priority. a. The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be (1) the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition * * *; (2) Wages, not to exceed $600 to each claimant, which have been earned within three months before the date of the commencement of the proceeding, due to workmen, * * * clerks, * * *."

This section gives the rule for paying out money from bankrupt's estate, after dealing with specific liens. A creditor having a valid lien does not come under the operation of this section dealing with priorities. A slight qualification of this general rule has been made by Sec. 67, sub. c, 11 U.S.C.A. § 107, sub. c. Moore's Bankruptcy Manual, Sec. 62.02, page 189.

Sec. 67, sub. c, dealing with liens, provides: "c. Where not enforced by sale before the filing of a petition in bankruptcy * * *, statutory liens * * * on personal property not accompanied by possession of such property * * * shall be postponed in payment to the debts specified in clauses (1) and (2) of subdivision a of section 64 [104] of this act [title], and, except as against other liens, such liens for wages or for rent shall be restricted in the amount of their payment to the same extent as provided for wages * * * in subdivision a of section 64 [104] of this act [title]".

This statute, in effect, says, as against other liens (such as the pledge lien of R. F. C.) the West Virginia labor lien is in full force and effect, and is not restricted as to amount. If this was a controversy between the wage earners and the common creditors, the wage earners would be restricted as to the amount of their statutory liens. Here the liens are so large that common creditors will get nothing. This limitation as to amount of a wage lien in the Chandler Act is new. It was intended to operate only for the benefit of general unsecured creditors. Therefore, it has been provided that as between wage claimants and landlords who hold liens, on the one hand, and other lienors, on the other hand, there should be no limitation, and such other lienors, for whom this limitation was not intended, shall not profit by such limitation.

Since the West Virginia statute gives a lien to the wage earner without limitation as to amount, with priority over any lien created subsequent to the time when such labor was performed, it is important to determine when the pledge of the manufactured lumber was created. In a brief filed in this court by R. F. C. it is said: "It may be conceded, we think, that the pledge agreement did not create a lien, in 1935, on lumber which was not stored on the yard until 1939". That statement is true, because one of the essential elements of a pledge is the actual delivery of possession.

The record is silent as to when this lumber at Sanderson was pledged with the custodian. All that is known is that it was in the possession of the custodian on April 6, 1939, the date of bankruptcy. Since all labor was performed prior to that date, all of the labor liens have priority over the pledge lien on the Sanderson lumber. However, these labor liens do not have priority over the liens of Sun which were created in 1928 prior to the time such labor was performed.

The only definite evidence as to when the lumber was pledged with the custodian at Fenwick is the statement of P. E.

Eakin to the effect that January 5, 1939, was the latest date that lumber was placed there. Therefore the wage earners have a lien upon the lumber at Fenwick for all work performed prior to January 5, 1939, ahead of the pledge lien. For labor performed after that date, they are subsequent in priority to the pledge lien.

Counsel have not cited any law or made reference to any equitable consideration which, under these circumstances, would accord R. F. C. the priority it seeks.

■■■■ Priority under section 64 is quite different from priority by virtue of a specific lien. Remington on Bankruptcy, 4th Ed., Sec. 2839, page 417; 8 C.J.S., Bankruptcy Sec. 453, page 1327; Lott v. Salsbury, 4 Cir., 237 F. 191. Statutory liens are enforceable under Sec. 67, sub. d of the Bankruptcy Act, 11 U.S.C.A. 107, sub. d, which provides for the presentation and enforcement of liens given in good faith and not repugnant to the Bankruptcy Act. Hiscock v. Varick Bank of New York, 206 U.S. 28, 41, 27 S.Ct. 681, 51 L. Ed. 945; Crim v. Woodford, 4 Cir., 136 F. 34, 42. Such liens are payable in bankruptcy out of the proceeds of sale of the property ahead of claims having priority under Section 64, 11 U.S.C.A. § 104.

■■■■ The third question relates to the priority of the deed of trust lien in the amount of $50,000, owned by Sun for money loaned to bankrupt in 1928. The referee subordinated it to the R. F. C. lien as to manufactured lumber at Sanderson, and of this action, Sun complains. This raises the question as to the right of a trust creditor to income from lumber which it has suffered to be removed. In West Virginia, a trust creditor has no estate in, or right of possession to, the trust property by virtue of the ordinary deed of trust alone. He has merely a chose in action secured by the trust, which may be enforced only by sale of the property. In the absence of a stipulation to the contrary, the grantor in a deed of trust is entitled to the income from manufactured lumber taken from the property until the trust is foreclosed by sale, or a decree is entered sequestering such income. Minor v. Pursglove Coal Mining Co., 118 W.Va. 170, 189 S.E. 297, 299; Sweeney v. Tabor, 118 W.Va. 591, 191 S.E. 295.

■■■■ On March 1, 1935, the date of the stand-by agreement, Sun's deed of trust claim of $50,000 was long overdue, having matured on April 2, 1931. It bore interest at six per cent payable quarterly in advance, the interest on which had been paid to April 2, 1931. When the stand-by agreement was signed, none of the timber on the Sanderson tract had been cut. Sun's security for its trust debt, as well as the unpaid portion of the vendor's lien debt was intact. It was in a position to have directed its trustee, Kurtz, to forthwith advertise and sell the property without the slightest impairment of its security. At that juncture, R. F. C. and Eakin submitted the stand-by agreement to Sun and the then holders of the vendor's lien notes, and thereby proposed that if Sun and the other lienholders would forego summary enforcement of Eakin's delinquent prior lien obligations, R. F. C. would loan Eakin $150,000 and thereby enable Eakin to procure funds from which to settle on a compromise basis with its many unsecured creditors, pay certain interest accruals on the lien debts, and provide it with working capital to proceed with its operations. In the disbursement of the $150,000, Sun received $1,477.48 for application to interest on its $50,000 trust deed debt. By the stand-by agreement, Sun was assured that part of the proceeds from the sales of lumber from the Sanderson tract were to be sequestered for the common benefit of Sun and R. F. C. and out of every thousand feet sold Sun was to receive $3.50 and R. F. C. $1.50. Sun was to apply this money first to payment of its vendor's lien and then to the trust debt. In my opinion, this was the same type of sequestration which it, or its trustee, might have obtained from a court of equity. The result is the same whether obtained by decree of court, or, by agreement.

In Minor v. Pursglove Coal Mining Co., supra, the trust creditors were given the right of recovery, in view of the noteholders foregoing their right to sell under the deed of trust and joining the lessors in suit.

Both Eakin and R. F. C. were parties to, and authors of the agreement, by which foreclosure under Sun's deed of trust was stayed so long as timber cutting and manufacturing operations went on at Sanderson. Having been partly responsible for getting Sun to agree to defer foreclosure under such conditions, for consideration of $3.50 per thousand feet of lumber sold, R. F. C. is not in a very good position to say that it is entitled to all the

proceeds from the sale of such lumber because Sun had not previously foreclosed —the thing which its agreement with R. F. C. expressly prohibited Sun from doing. Sun is entitled to a lien upon such part of the proceeds from the Sanderson lumber as it would have received had bankruptcy not intervened, that is to say, $3.50 out of each thousand feet sold, after payment of vendor's lien debts, inasmuch as the trustee sold such lumber for $13.95 per thousand feet.

I cannot agree with the contention of the R. F. C. that any pledge of lumber subsequent to November 20, 1935, the date of the original lease and pledge agreement, relates back to that date, and is prior to any other lien thereon. It is contended that an equitable pledge lien was created on manufactured lumber which had not yet come into existence, and that such lien is superior in priority to both the lien of the seller of the timber and the lien of the laborer who produced it.

Summarizing, the liens upon the proceeds of the Fenwick and Sanderson lumber, in my opinion, should have been allowed in the following order:

Fenwick lumber: Vendor's liens previously allowed in former review, and opinion by me reported in 34 F.Supp. 460; labor liens for work performed prior to January 5, 1939; R. F. C. pledge lien.

Sanderson lumber: Sun vendor's lien in the amount of $21,047.37 and accrued interest; labor liens; Sun's deed of trust lien to the extent described above; R. F. C. pledge lien.

As to claims of A. J. Williams upon two notes of $620.26 and $204.71, both disallowed by the referee, it appears to the court, and is admitted by counsel, that such claims should be allowed as common claims. It appears to the court that the wage claim of Pirl Barnett for $237.83 was lost by his failure to give notice as required by the West Virginia statute, and was properly classified by the referee as an unsecured claim.

The orders of the referee entered herein on January 6, 1941, and January 9, 1941, are hereby affirmed in part and reversed in part, and the case is remanded for further proceedings in accordance with this opinion.

Affirmed in part; reversed in part.