# CHARLESTON.

## WIGGIN *et al. v.* MANKIN.

Submitted September 8, 1908. Decided February 23, 1909.

1. LOGS AND LOGGING—*Seller's Lien—Subsequent Purchasers.*

    Where the owner sells standing timber, to be severed and delivered by him to a purchaser thereof, at a mill to be located on the seller's land, he to hold one third of the lumber manufactured therefrom, on stick on the yard until paid for, and the timber is severed and so delivered, and manufactured into lum-

ber, and two thirds thereof delivered by the purchaser to his vendee, pursuant to a contract in writing, made and recorded before the timber is cut from the land, the other one. third remaining on stick on the mill yard, held by the seller under his contract, the seller has the right to hold said one third by virtue of his seller's lien, reserved in his contract, though unrecorded, as against the claims of such subsequent purchaser, until his purchase money be paid. (p. 225.)

2. SAME.

Although a seller may sever timber located on his land, and deliver it at a mill of purchaser located thereon, pursuant to contract, but because of the non-removal provision thereof, only constructively delivering the same to the purchaser, and thereby to execute the contract, and to pass the title thereto, yet so long as the seller remains in constructive possession of the lumber so retained on his land, and has not abandoned the same, his seller's lien for balance of purchase money continues valid and binding, as against such subsequent purchaser from, or creditors of his vendee. (p. 227.)

3. SAME—*Waiver—Execution—Levy.*

Such seller does not lose, or waive, his seller's lien on such lumber by pursuing the purchaser to judgment for balance of purchase money due him, or by causing the lumber so held by him in actual or constructive possession, to be levied on under execution on his judgment to satisfy the same, unless there is manifest intention to abandon his seller's lien for the lien of his execution, not manifested by the mere recovery of such judgment, and levy of such execution. (pp. 227, 228.)

Error to Circuit Court, Raleigh County.

Action in a justice's court by H. D. Wiggin and others against J. J. Mankin. There was a judgment for defendant, and plaintiffs appealed to the circuit court, where defendant again had judgment, and plaintiffs bring error.

*Affirmed.*

FILE & FILE, for plaintiffs in error.

J. J. MANKIN, in pro. per.

MILLER, PRESIDENT:

Wiggin is plaintiff and Mankin defendant in a proceeding begun by Wiggin before a justice in Raleigh county, under section 2102, Code 1906, to try the right and interest claimed by him to about forty thousand feet of lumber, situated on the

land of Mankin, the product of timber cut by Mankin from his land, and delivered at a mill site thereon, pursuant to a contract in writing wth one McGinnis. This lumber had been levied on by a constable to satisfy an execution on a judgment of the justice in favor of Mankin against McGinnis for $187.87, and costs, balance of purchase money on said timber, and was about to be sold by the constable, when plaintiff intervened and filed his petition claiming title thereto. In his petition filed with the justice, Wiggin did not set forth the source of his title, but represented in general terms, that he was and always had been the owner of said timber, and that he 'was entitled to have the same released from said levy. At the time of filing his petition, the petitioner gave bond, as provided by statute, in the penalty of $400.00, conditioned to pay the claim of the plaintiff in said execution and the costs of the trial of said issue, if he should fail to prove that, at the time said lumber was levied upon, he had such claim thereto or interest therein as entitled him to have same released; and thereupon upon order of the justice, as provided by statute, the lumber was released by the constable and turned over to Wiggin. On the trial of the issue before the justice he found for Mankin, and gave judgment on the bond for the principal of the debt with interest and costs, and Wiggin and the sureties on his bond appealed to the circuit court, and upon the trial there, *de novo*, the jury, on the issue joined, found for Mankin, and fixed the value of the property levied on under the execution at $187.87, with interest from October 16, 1907; and on February 18, 1908, the court pronounced judgment thereon, that Mankin recover of Wiggin and the sureties on his appeal bond, the sum found by the jury in their verdict with interest, costs and an attorney's fee of $10.00, and it is to that judgment that Wiggin is prosecuting this writ of error.

The facts proven on the trial in the circuit court, and not the evidence, are certified here by bill of exceptions. They show that Wiggin's claim to the lumber was based upon a tripartite contract with McGinnis, made April 2, 1906, separately signed, but to which there was but one joint acknowledgment by the parties, recorded in Raleigh county, April 14, 1906. By the first part of the contract McGinnis, in consideration of $1.00, undertook to lease "to said Wiggin a certain lot of land upon which shall be piled the logs or the lumber resulting therefrom,

of a contract of sale and purchase of even date for 300,000 feet, Oak, 50,000 feet, Chestnut," between said Wiggin and McGinnis "for so long a time as the logs or lumber resulting therefrom * * * * * may be piled thereon; this land being the property of J. J. Mankin & Minus Hawley, of Marshes, W. Va." By the second part McGinnis agreed with Wiggin to haul and put into cars the lumber covered by the contract, at $5.00 per thousand feet, making the purchase price therefor, f. o. b. cars at loading point, the several sums stipulated therein per thousand feet, for firsts and seconds, common and culls, and that when Wiggin should have received from his inspector, bills of lading, and in-- voice of any lumber shipped on said contract, and another contract of same date, between the same parties, covering the same lot of lumber, Wiggin should first deduct from the first shipments made, the money advanced by him on these contracts, and should then remit balance in full to McGinnis. By the third part McGinnis "agrees to sell to H. D. Wiggin of Boston, Mass., and said Wiggin agrees to take from said . . . . . . . . . . . . . during the year 1906, 3,000,000 feet Oak, 50,000 feet Chestnut, * * * * * now standing on J. J. Mankin & Minus Hawley tracts of land, or all the oak and chestnut bought of J. J. Mankin and M. Hawley." This part of the contract, besides providing for the thickness and lengths into which the lumber is to be cut; and that it is to be sawed as quickly as possible, thoroughly air-dried, hauled to the cars, and delivered in conformity with the conditions stipulated, and for which Wiggin was to pay the prices per thousand feet, stipulated therein, also contains these stipulations: "Said McGinnis states that the logs from which the lumber of this contract is to be sawn are free from any incumbrances, and in consideration of said Wiggin paying, on account of this contract for lumber not as yet sawed, $1.000 dollars (the receipt of which is hereby acknowledged) and a further sum of . . . . . . . . . . . said McGinnis agrees that he will faithfully carry out the conditions of this contract as above specified, and that the title to all logs bought by him on this contract and the lumber resulting therefrom shall be vested in said Wiggin until said McGinnis shall have delivered to said Wiggin on cars an amount of lumber from this contract to the value of one thousand dollars, which amount shall be acknowledged by said McGinnis to apply on account of the stock delivered on this contract as

payment thereon. * * * * *    And it is further agreed that this lumber shall be piled on land that shall be leased to•said Wiggin, and that said McGinnis shall pay interest at 6 per cent. on all money paid; on this contract by said Wiggin for lumber not shipped, but paid for."

Mankin claimed the right to subject the lumber to the payment of his debt for purchase money, not only by virtue of his judgment and execution against McGinnis,but by right of his contract with McGinnis and possession thereunder, made March 10, 1906.. This contract provided, "That in consideration of ($150.00-100) paid, receipt of which is hereby acknowledged, the party of the first sells, grants and conveys to the party of the second part a certain boundary of timber in the Co. of Raleigh, W. Va. bounded and described as follows:  All timber on the East of the road of the Locust ridge road and Hank C. Lemens, Lewis Snuffer, supposed to contain 100 M. more or less, at $6.00 per M on skidway at mill.  The party of the second part agrees to pay to the party of the first part for said timber $100. the 15th of July, 1906 and furnish expense of logging & cutting same and the remainder to be paid Jan. 1st 1907.  (The party of the first part to hold 1-3 of same on the stick on yard until paid).  This contract shall include the timber adjoining the Jas. Acord tract to be sawed at the Jos. Meadow school house." This contract was never recorded.

The contract of Mankin with McGinnis does not provide where the mill was to be set, or the yard in which the lumber to be piled on stick was to be located, but it is agreed that Mankin required McGinnis to locate his mill on Mankin's land, where the timber was, and where he required McGinnis to saw the logs and stack the lumber on stick, and that all the lumber in controversy here was manufactured from the timber sold McGinnis by Mankin under said contract, and that the lumber in controversy here at the time it was levied on and taken by plaintiff was still on the land of Mankin, at the mill and on the mill yard, where Mankin had required the mill to. be located and the lumber to be stacked.  It was proven on behalf of Wiggin, that about 120,000 feet of lumber had been cut from the land of Mankin and that Mankin had not separated the one third of the lumber reserved or attempted to be reserved, in his contract with McGinnis, from the other two thirds

65 W. Va.

thereof; but it was proven by Mankin that he had retained possession of about one third of the lumber, as he supposed, and that Combs for Wiggin, as he supposed, had taken about two thirds thereof; that he had retained possession of the residue levied on, as security for his purchase money, and had prevented Wiggin from removing same from the yard until his purchase money was paid. It is proven also that after McGinnis completed sawing on the Mankin land, and before the mill had been removed, Combs, agent for Wiggin, went to the home of Mankin for the purpose of marking the lumber "sold to H. D. Wiggin," at which time Mankin notified Combs of his contract with McGinnis, and that McGinnis still owed him on account of the purchase money, and that he would not permit the lumber to be marked or taken by Wiggin until his purchase money should be paid; that Combs did not, at that time, mark the lumber, but afterwards returned with McGinnis, while Mankin was absent, when McGinnis pointed out the lumber to Combs and directed him to mark the same, as sold Wiggin, which was done; that neither Wiggin nor Combs knew that McGinnis owed Mankin, nor the character of the contract between them respecting the timber. It was proven also that all the timber cut from Mankin's land, except that so retained and levied upon, had been delivered by McGinnis to Wiggin pursuant to his contract.

It is claimed by Wiggin that whatever rights Mankin may have had to said lumber as against McGinnis, that his rights as purchaser, under his contract with McGinnis, are paramount and superior to those claimed by Mankin; that as Mankin's contract was not recorded, so as to give him notice thereof, and provided for the severance of the timber, and its conversion into personal estate, its provision entitling Mankin to retain one third of the product on stick until payment of all of the purchase money, in law amounted simply to a pledge of the lumber, without separation from the two thirds, and reduction thereof to possession, was invalid as against Wiggin, and that Mankin is not entitled, as against him, to hold the lumber, either by virtue of his execution against, or of his contract with McGinnis. While it was proven that Mankin had not actually separated the lumber reserved, yet Wiggin proved that the lumber cut from Mankin's land amounted in all to about 120,000 feet, the 40,000 feet remaining thereon constituting about one third of

the total product. And it was proven by Mankin, although he thought there was but about 25,000 feet of the lumber remaining, that he had held possession thereof, under his contract, as security for his purchase money. The fact, which is undisputed, is that about one third of the lumber cut from his land was being held by Mankin, and that this was such separation of it from the other two thirds, as entitled him to hold it as security for his purchase.

But Wiggin claims, as his contract was recorded and Mankin's was not, he is entitled to the lumber, as an innocent purchaser thereof without notice. His contract with McGinnis told him that the timber from which the lumber was to be manufactured was standing on Mankin's land. He knew Mankin was in possession of the land, and that McGinnis professed to have bought the timber from him. He was bound to know the source of McGinnis's title, and the character thereof; his contract with McGinnis pointed to Mankin as the source of title, and so long at least as the timber remained standing, and the lumber remained on the land of Mankin, and in his possession, actual or constructive, Wiggin was bound to take notice of his rights, if any. By the attempted lease to Wiggin of a "certain lot of land" upon which the logs and lumber should be piled, the purpose no doubt, was to give Wiggin possession of the logs and lumber as delivered and stacked thereon. But that same lease gave Wiggin notice that the land was the property of Mankin. What right had McGinnis to lease him Mankin's land? The only right he had was covered by his contract with Mankin. Wiggin acquired no right thereto not covered by said contract; he held under it, and was bound to know what it contained. Besides, we see from part third that McGinnis thereby only, "*agrees* to sell and Wiggin *agrees* to take from . . . . . . . . . . . . during the year 1906," a certain quantity of lumber. The agreement to sell, and the agreement to take was hardly sufficient to pass title to either the timber or the lumber, and the contract does not seem to have contemplated passage of title until delivered to Wiggin by McGinnis "f. o. b. cars at loading point," as provided in part second of the contract. It is true that by the third part of the contract McGinnis undertook to invest in Wiggin the title to all logs bought by him on this contract, and the lumber resulting therefrom until Wiggin

should have delivered to McGinnis on cars an amount of lumber sufficient to cover the $1,000.00 advance. But it is a question whether this contract is not void for uncertainty of description, a question, however, not necessary to decide, for it cannot prevail against the rights of Mankin to hold the lumber, if his contract so provides. We are led then to inquire what are, or were the rights of Mankin under his contract, unrecorded though it was? And did he waive his rights by obtaining judgment against McGinnis, and levy of his execution upon the lumber in controversy to satisfy the same? The contract with McGinnis clearly gave him the right to hold one third of the lumber until his purchase money was paid. The proof was that the 40,000 feet of lumber remaining, constituted about one third of all the lumber manufactured from the timber taken therefrom. Why then deny Mankin his rights? It is answered for Wiggin that the contract between Mankin and McGinnis contemplated severance of the timber from the land, and conversion thereof into lumber—personal property—and that the delivery of the logs by Mankin at the mill passed the title to the lumber to McGinnis; and, there being no lien on personal property in favor of the vendor for purchase money, any attempt to reserve title to property delivered, as security for unpaid purchase money, without notice thereof duly recorded, is void, as against creditors and subsequent purchasers, by virtue of section 3101, Code 1906; that there can be no pledge of the personal property, thus sold and delivered, without re-delivery by the vendee and possession by the vendor.

But the status of Mankin, as we construe his contract with McGinnis, is neither that of vendor having retained title to goods delivered, nor that of pledgee thereof. The claims of Wiggin in relation thereto, we think are fully answered by prior decisions of this Court. The lien claimed by Mankin is under that clause of his contract prohibiting removal from the land before payment. Such lien, as was said by this Court in *Buskirk Bros.* v. *Peck,* 57 W. Va. 360, 370, "is well known to the law as the seller's lien for purchase money;" and, as is there held, although retention of the possession of the property until payment is essential to its existence, yet possession may be constructive or actual, and where goods are sold, counted out and

set apart for the purchaser, but not actually delivered into his possession, the title passes, and there is constructive delivery sufficient to execute the contract, yet the seller had a lien for the purchase money.   In that case, as in the case at bar, the property, by the terms of the contract, may have passed into the hands of the vendee, under his personal dominion, and wrought into a new form and nature by his acts, but the same was on the land of the vendor, and but for the non-removal clause the vendor would have had no lien; but as the contract here, as in the *Buskirk case,* contained the non-removal clause, under the authorities the vendor is said to hold a sort of constructive possession, sufficient to support his lien for purchase money.   The same doctrine was laid down and applied in *Curtin* v. *Isaacsen,* 36 W. Va. 391, 396, 397.   In the latter case, Judge BRANNON says, that "I do not regard section 3, chapter 74, Code as bearing on the case;" and point four of the syllabus is: "A seller of goods has a lien upon them for their price, unless stipulated otherwise, so long as they remain in his possession."

Did Mankin lose his lien by pursuing McGinnis to judgment and levy of his execution on the lumber claimed?   Mankin had not parted with his possession; he had a right to judgment against McGinnis for what McGinnis owed him.   In the case of *Curtin* v. *Isaacsen,* a part of the property in controversy was certain timber from the lands of one Scott, which Scott had sold to Isaacsen, and which he had agreed to saw into lumber for Isaacsen, and having sawed it accordingly, had brought a chancery suit, and levied an attachment upon the lumber to cover the debt due him from Isaacsen therefor, claiming also, that as the lumber was still on his land, he had a lien for its price, as well as an attachment lien thereon.   The controversy in that suit was between Curtin & Co., claiming said timber by purchase from Isaacsen, and certain creditors of Isaacsen.   The decree of the court below awarding to Scott preference for his debt on the lumber which he had sold to Isaacsen, was, on appeal affirmed by this Court.

Affirming that the position of Mankin is that of pledgee of the property, we are cited by counsel for Wiggin to 16 Ency. Pl. & Prac., 636, for the proposition, that a creditor who holds property in pledge, and sues and attaches the property pledged, waives

his lien thereon. But on the preceding page of the same volume we find this: "The recovery of a judgment by a pledgee does not result in a waiver of his lien upon the pledge, nor is it waived by the issuance of an execution under the judgment, or the arrest of the debtor upon execution." Only one of the authorities cited therefor, we think support the first proposition, that of *Bank v. Dows,* 68 Iowa, 460, and we doubt if it does. In that case corn in the crib was claimed to have been orally pledged or mortgaged to plaintiff by Grant & Johnson; but the corn was actually in the possession of one Mason, for the use and benefit of the plaintiff, when the same was attached by David Dows & Co., as the property of Grant & Johnson. The lien claimed by plaintiff was for money advanced to purchase the corn, and other legitimate purposes; defendants claimed plaintiff was estopped from asserting the lien by reason of its suit against Grant & Johnson to recover the amount claimed to be due it and the attachment sued out therein and levied by the sheriff thereon; but a part of it was sold and the money realized by the officer was received from him by plaintiffs as money realized from the property of Grant & Johnson, and it was said that the plaintiff never claimed to be the owner of the corn, or to have any lien thereon, until they commenced their suit. The particular question in that case was, did these facts amount to a waiver, or abandonment of the lien based on the oral pledge or mortgage; and the court says: "We are forced to the conclusion that the inquiry must be answered in the affirmative." But it will be found, that most of the decisions cited, if not all of them, relate to cases involving mortgages of property, and where there was a plain intention on the part of the mortgagee to abandon his mortgage, and rely upon the lien of his attachment, the cases turning upon the question whether there was intention to abandon the prior lien. The Iowa court does not think *Clark* v. *Ward,* 12 Grat. 440, and *Christian* v. *Dripps,* 28 Pa. St. 271, referred to, opposed to its views, yet we think the Virginia case clearly is, for it is held in that case, that because the attachment of a creditor, secured by a deed of trust in favor of himself and others, fails, this does not preclude him from his right to claim under the deed his ratable proportion of the trust fund. 3 Pars. Cont. 244, 245, and Story on Agency, section 367, are also cited by the

Iowa court, for the proposition, that the moment the pledgee
voluntarily parts with such possession or claims the right to detain
the goods upon a different ground, the right to the lien is lost,
upon the principle that he is precluded from claiming by con-
flicting rights.   But it will be found by reference to these
authorities that there must be manifest intention to abandon the
lien or the pledge of the property surrendered in order to amount
to abandonment.   Parsons says, at the page cited:   "But a
transfer of the property to a third party, with notice of the
lien, and accompanied by a transfer of the right, will not divest
the lien.   For the third party will in such case be regarded as
the servant or representative of the claimant."   And Story on
Agency, section 367, cited, says:   "But it might be different in
a case, where the transfer was merely qualified, and not absolute;
for, if such transfer were rightful, then the lien would not be
lost."

But whatever may be the law respecting the rights of pledgees
of property, when attaching the property pledged as the property
of the pledgor, there seems to be no question that the lien of the
pledgee is not lost by judgment against the pledgor, and execu-
tion levied on the property pledged, unless there is manifest in-
tention on the part of the pledgee to abandon his lien, not
manifested by judgment and execution thereon.   It is conceded
that the pledgee would have a right to expose the pledged
property to sale to satisfy his debt, and by obtaining judgment
and execution and a sale by the officer as his agent in satisfaction
of his debt, there is no manifest intention to abandon the lien
of his pledge; and, as was said in *Jones* v. *Scott,* 10 Kans. 37,
"then as the judgment does not destroy the lien what valid objec-
tion can there be to having an execution issued, and having
an officer of the law give notice and sell according to law?"
Referring to this case a later Iowa case says:   "The authorities
cited by appellees to support that rule show in every case, or
warrant the belief, that the party intended the act charged as
constituting a waiver."   *Valley Nat. Bank* v. *Jackaway,* 80 Iowa,
512, 516.   In the case just cited it was claimed that the plaintiff
by obtaining a judgment and execution, and placing a note
pledged in the hands of the sheriff for sale on a general execu-
tion, instead of a special one, divested the plaintiff of his lien by

virtue of the pledge; but this proposition was denied. To the same effect is *Burnham* v. *Windram,* 164 Mass. 313; *Beckwith* v. *Sibley,* 11 Pick. 482; *Smith* v. *Strout,* 63 Me. 205, and other cases cited for the proposition in 16 Ency. Pl. & Prac., *supra.* All of these cases are in accord with our own cases cited, especially applicable to the case at bar. And in the case of *Williams* v. *Gillespie,* 30 W. Va. 586, much relied upon by the plaintiff in error, it is said: "It is not questioned that, when there is a sale of personal property to be paid for on delivery, the vendor has a lien for the price so long as the property remains in his possession; but the transfer or surrender of possession by the vendor, even at common law, destroyed any such lien." In that case the contract contained no provision for retention of the property, subsequently pledged by oral agreement, as security for the unpaid purchase money. The proof showed that the lumber there involved was sold and delivered to the purchaser, and though still on land of the seller, it was held that as the title of the seller passed by delivery to the purchaser, and there was no re-delivery thereof to the seller, and possession taken by him, the seller acquired no lien thereon.

But it is said the verdict and judgment as to the value of the property can not be sustained because there was no proof thereof. It was agreed, however, that some 40,000 feet of lumber was levied on, and at the price per thousand feet which it was shown Wiggin agreed to pay for it, it exceeded in actual value the sum found by the jury, and the verdict and judgment is fully supported, we think, by these facts.

These views require affirmation of the judgment below, and sufficiently respond to all other questions presented by bills of exceptions to instructions given and refused, motion in arrest of judgment and motion for a new trial, and we need make no further response thereto.

*Affirmed.*