**RECONSTRUCTION FINANCE CORPORA-
TION v. SUN LUMBER CO. et al.
In re EAKIN LUMBER CO.**

No. 4882.

Circuit Court of Appeals, Fourth Circuit.

March 9, 1942.

732

Stuart G. Christian, of Richmond, Va., and H. L. Snyder, of Charleston, W. Va., for appellant.

Herbert M. Blair, of Weston, W. Va., for Sun Lumber Co., appellee.

O. C. Lewis, of Summersville, W. Va., for J. R. Harrison et al., Labor Lien Claimants, appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in a controversy arising in the bankruptcy proceedings of the Eakin Lumber Company with respect to priorities of liens attaching to lumber stored on the yard of the lumber company at Sanderson, West Virginia, and sold by the trustee in bankruptcy for the sum of $27,915.36. The lien claimants are the Sun Lumber Company, which asserts a vendor's lien for unpaid purchase money amounting to $21,047.37 and a lien under a deed of trust to secure a loan of $50,-000, the Reconstruction Finance Corporation, which asserts a lien as pledgee of the lumber, and a number of wage claimants, who assert liens under the statutes of West Virginia. The court below accorded priority to the liens claimed in the following order: (1) The vendor's lien of the Sun Lumber Company, (2) liens for labor performed within three months of bankruptcy, (3) liens for wages earned prior to that date, (4) the mortgage of the Sun Lumber Company to the extent of $1,002.52, and (5) the lien of the Reconstruction Finance Corporation. See In re Eakin Lumber Company, D.C., 39 F.Supp. 787.

The Reconstruction Finance Corporation has appealed from this order, contesting the priority allowed the vendor's lien of the Sun Lumber Company and also the liens and priorities allowed the wage claimants. The Sun Lumber Company has not appealed and does not contest here the disposition made of the claim of lien under its deed of trust; and the wage claimants have not appealed and do not contest the priority accorded the vendor's lien of the Sun Lumber Company. While the Reconstruction Finance Corporation contests the allowance of any lien whatever under the Sun Lumber Company's deed of trust, it is conceded that this point has no practical significance if the other liens are accorded the priority allowed them by the court below. In the view which we take of the case, only two major questions need be considered by us: (1) Whether the court below correctly accorded priority to the vendor's lien asserted by the Sun Lumber Company, and (2) whether the liens of the wage claimants were correctly accorded priority next in order. We shall consider these questions separately.

## The Vendor's Lien

The lumber at Sanderson, to which the lien contest here involved relates, was cut by the bankrupt, the Eakin Lumber Company, from certain lands in Kanawha County, West Virginia, belonging to the Blue Creek Coal and Land Company. This company in the year 1924 conveyed all of the standing timber on this land above 12 inches in diameter to J. H. Brewster and G. P. Gillespie, who in turn conveyed it, in 1925, to the Moon Lumber Company. The Moon Lumber Company, in 1928, conveyed it to bankrupt, in a deed which recited the execution of purchase money notes by the bankrupt and expressly retained a "vendor's lien" on the property sold to secure the payment of "the deferred installments of purchase money and the notes evidencing the same". The amount remaining due on this purchase money is evidenced by notes now held by the Sun Lumber Company in the principal sum of $21,047.37.

The deeds from the Blue Creek Coal and Land Company to Brewster and Gillespie provided that the timber should be cut and removed from the land within a period of ten years from the date of the deeds, and that all timber not so cut and removed within that period should revert to the owner of the land. In 1929 the Blue Creek Coal & Land Company entered into an agreement with bankrupt, by the terms of which the period for the cutting and removal of the timber was extended for a period of five years, and on October 1, 1935, entered into another agreement by which the period for cutting and removal was extended for an additional period of three years. These agreements recited the conveyance of the timber by the Blue Creek Coal and Land Company to Brewster and Gillespie, the conveyance by them to the Moon Lumber Company and the conveyance by the latter to the bankrupt, and each was based upon a consideration of $2,500 for which the extension of time for the removal of the lumber originally sold was granted. Question is made as to the validity of the vendor's lien reserved by the Moon Lumber Company, in view of the fact that the time for the removal of the timber granted by the land owner had expired and the contracts of exten-

sion had been entered into with the bankrupt; but it appears that in "stand-by" agreements executed in 1935, to which both the Reconstruction Finance Company and the Sun Lumber Company were parties, the validity of the vendor's lien reserved by the Moon Lumber Company as security for notes held by Sun Lumber Company was expressly recognized, and a deed of trust taken by the Reconstruction Finance Corporation at the time was expressly made subject thereto, although the original ten year period for the removal of the timber had already expired and any rights of the Sun Lumber Company under the vendor's lien were dependent upon the extension agreements, both of which had already been executed and were referred to in the deed of trust.

The lumber in controversy was piled, not within the boundaries of the tract from which it was cut as set forth by metes and bounds in the deeds from the Blue Creek Coal and Land Company, but on an adjoining tract belonging to that company immediately across the creek from that tract. This was done under authority contained in one of the deeds from the company which provided: "The party of the first part further gives and grants to the parties of the second part the right to the use of sufficient bottom land on the northerly side of Blue Creek of the lands of the party of the first part at the mouth of Board Tree Hollow for a mill site for the location and operation of a saw mill and lumber yard thereon during the term of this agreement for the manufacture and removal of said timber, together with a sufficient right of way for transportation or hauling logs, timber or lumber over the lands of the party of the first part from said mill site to the Kanawha and West Virginia Railroad at its station at Sanderson in said Kanawha County, but said mill site and rights of way are to be so located and used as to do the least practicable damage to the property of the party of the first part and so as not to interfere with its operations for coal or other minerals or products of said lands." The rights thus conveyed by this deed were duly transferred to bankrupt in the deeds from Brewster & Gillespie to Moon Lumber Company and by Moon Lumber Company to bankrupt, both of which transferred all rights originally conveyed by the land company; and the evidence leaves no doubt that the lumber yard upon which the lumber in controversy was piled was within the bottom upon which the right to maintain a lumber yard was granted by the deeds conveying the timber rights. There is evidence that the bankrupt took a lease from the land company covering this lumber yard; but there is evidence, also, that the purpose of taking the lease was to obtain the use of certain dwelling houses on the leased premises and to remove all question as to the right of the bankrupt to use this particular property as a lumber yard.

No lumber was cut at Sanderson until after the year 1935. On November 20th of that year "stand-by" agreements were entered into by creditors of the bankrupt, including the Sun Lumber Company, to enable bankrupt to obtain a loan of exceeding $100,000 from the Reconstruction Finance Corporation so that it might continue operations. One of the terms of this agreement was that lumber might be cut and sold by the bankrupt from the land at Sanderson, but that bankrupt should pay the Sun Lumber Company $3.50 per thousand feet from the purchase price obtained for same. Another of the terms was that upon bankruptcy or insolvency proceedings intervening, any stand-by creditor might assert any claim held by him, upon proof, which has been made, that such creditor had not instituted such bankruptcy or insolvency proceedings. At the time of the loan, the bankrupt, in addition to giving other security, executed a deed of trust to secure the loan on the timber rights which it held on the lands of the Blue Creek Coal and Land Company, subject, however, to the rights of the Sun Lumber Company under the vendor's lien and mortgage held by it. Bankrupt agreed also, as one of the terms of the "stand-by" agreements, to pledge to the Reconstruction Finance Corporation 5,000,000 feet of lumber, later increased to 6,000,000 feet, upon its yards at Fenwick and Summerville. There was no lumber upon the yard at Sanderson at this time, and there was no agreement that any lumber there should be pledged. Later, bankrupt agreed with the Reconstruction Finance Corporation to pledge with it 2,-000,000 feet of lumber on its lumber yard at Sanderson, and executed a lease to a custodian for the Reconstruction Finance Corporation of a part of the yard and delivered lumber to him to be held in

pledge by him there as security for the indebtedness due the Reconstruction Finance Corporation, with provision for the sale of lumber so pledged and the substitution of other lumber as manufactured in its stead. The lumber so pledged was surrounded by a fence and signs were erected to the effect that it was held in pledge for the Reconstruction Finance Corporation. The Sun Lumber Company was not a party to the agreement under which this pledge of lumber at Sanderson was created, and is not shown to have agreed to same or to have had any notice or knowledge thereof, although it is shown that the president of the Sun Lumber Company was a director of the bankrupt. The pledged lumber was upon a part of the lumber yard established by bankrupt in the bottom across Blue Creek to which we have heretofore referred.

Upon these facts, four questions with respect to the vendor's lien are presented for our consideration: (1) Was a valid vendor's lien created with respect to the lumber cut at Sanderson? (2) If so, was the vendor's lien lost as a result of the expiration of the time limit in the original deed from the land owner and the extensions granted by the land owner to the bankrupt? (3) Was the vendor's lien lost by the removal of the lumber from the premises on which it was cut? And (4) was the vendor's lien lost as a result of agreements entered into with Reconstruction Finance Corporation by the vendor or by the bankrupt? We think that the first question should be answered in the affirmative and all the others in the negative.

On the first question, we think there can be no doubt but that, under the law of West Virginia, there was a valid vendor's lien in favor of the Sun Lumber Company on the lumber cut at Sanderson, if the lien had not been lost by any of the matters adverted to above. While the rule does not prevail in all jurisdictions, it is undoubtedly the law in West Virginia that lumber cut from timber subject to a vendor's lien is also subject to such lien so long as it remains on the premises and thus within the constructive possession of the vendor. Curtin v. Isaacsen, 36 W. Va. 391, 15 S.E. 171; Buskirk Bros. v. Peck, 57 W.Va. 360, 50 S.E. 432; Wiggin v. Mankin, 65 W.Va. 219, 63 S.E. 1091; Justice v. Moore, 69 W.Va. 51, 71 S.E. 204, Ann.Cas.1912D, 17; Acadian Coal & Lumber Co. v. Brooks Run Lumber Co., 88 W. Va. 595, 107 S.E. 422.

The conveyance from the land company conferred upon the grantees of the timber rights and their subsequent grantee, the Moon Lumber Company, such rights of possession in the land as were necessary to the enjoyment of the timber rights therein granted; and the reservation of the vendor's lien in the conveyance by the Moon Lumber Company to bankrupt amounted to the reservation of such rights of possession in the land as were necessary to the enforcement of the lien thus reserved. There can be no question but that, under such reservation, lumber cut from the land remained subject to the vendor's lien so long as it remained upon the premises. As said in Justice v. Moore, supra [69 W.Va. 51, 71 S.E. 205, Ann.Cas. 1912D, 17]: "This clause says only that the timber shall stand good for the purchase money. * * * Though the lien clause does not expressly reserve right to detain the timber until paid for, the vendor had such right as long as it remained upon his land, under principles declared in Curtin v. Isaacsen, 36 W.Va. 391, 15 S.E. 171. It is a common-law right in the seller, which the lien clause in the contract does not relinquish in express terms, nor by necessary implication. This clause could have been intended to secure to the seller a lien in addition to that given by the common law, one continuing after removal from the premises, and may have been inserted in the contract for this purpose. Jones on Liens, § 816. However this may be, nothing in its terms indicates intent to abrogate the seller's common-law lien. As this timber was all on the premises of the plaintiff at the date of the execution of the deed of trust, the right created by that instrument, as to possession, was necessarily subordinate to that of Justice."

In Acadian Coal & Lumber Co. v. Brooks Run Lumber Co., supra [88 W.Va. 595, 107 S.E. 427], the rule is thus stated: "The vendor of standing timber to be cut and removed from his land by the vendee has such a lien on the timber and the lumber manufactured as long as it remains upon his premises, unless it is otherwise stipulated in the contract. While it remains on his premises it is deemed to be within his possession, notwithstanding the cutting and manufacture thereof by the

vendee and his limited control of the premises. Justice v. Moore, 69 W.Va. 51, 55, 71 S.E. 204, Ann.Cas.1912D, 17; Curtin v. Isaacsen, 36 W.Va. 391, 15 S.E. 171; Wiggin v. Mankin, 65 W.Va. 219, 63 S.E. 1091."

We come, then, to the second question, which is whether the vendor's lien on the timber was lost by the expiration of the ten year period limited in the deed from the Blue Creek Coal and Land Company, and the execution of the extension agreements by that company to the bankrupt. The position of the Reconstruction Finance Corporation is that the rights under the original deed from the land company expired with the expiration of the ten year period, that with them expired the vendor's lien based upon the sale of such rights, and that the extension agreements obtained by the bankrupt created new rights not subject in any way to the lien. This position ignores the fact that the timber rights granted in the original deed of the land company were expressly recognized in the extension agreements as having been conveyed to the bankrupt and that these agreements merely purported to extend the period for the removal of the timber recognized by them as already having been conveyed. In other words, they did not amount to a new conveyance of the timber on the land but merely extended the period for the removal of timber already conveyed and waived the right to insist upon a forfeiture for failure to remove it within the period originally limited. The rule is well settled that "notwithstanding the time for removal of timber may be limited, the parties may by subsequent agreement extend the time for removal, in which event the new time takes the place of the former one". 34 A.J. 514, 38 C.J. 171; note, 15 A.L.R. 85; Morgan v. Perkins, 94 Ga. 353, 21 S.E. 574; Fletcher v. Livingston, 153 Mass. 388, 26 N.E. 1001. The land company was the one to which the timber would revert upon the forefeiture. The bankrupt was the purchaser of the timber subject to the vendor's lien. When all that the bankrupt did was to secure an extension of time for removing the timber which it had purchased and which was subject to a lien for the purchase money, it is little short of absurd to suggest that as a result of this extension the vendor's lien was discharged. Under the law of West Virginia, a conveyance of timber vests a defeasible fee in the grantee. Hill v. Vencill, 90 W.Va. 136, 111 S.E. 478. The period limited for the removal of the timber merely prescribes the condition upon which the fee is to be defeated; and an extension of the period for removal manifestly does not amount to a conveyance of new rights in the timber, but merely prevents the forfeiture under the defeasance clause of rights already granted.

We think, also, that the Reconstruction Finance Corporation is not in position to make any such contention with respect to the validity of the vendor's lien here involved. The stand-by agreements to which both it and the Sun Lumber Company were parties recognized the validity of the vendor's lien of the Sun Lumber Company; and these agreements were executed in 1935 after the expiration of the ten year period limited in the deed of the land company and after the extension agreements had been obtained by the bankrupt. The recognition of the validity of this lien and the provision made for its payment from the proceeds of lumber sold were considerations upon which the promise of the Sun Lumber Company to withhold action was founded. Furthermore, the Reconstruction Finance Corporation at that time accepted a deed of trust on the very timber rights here involved, which recognized the priority of the vendor's lien of the Sun Lumber Company, as well as its rights under a mortgage on the same timber rights executed by the bankrupt at the time of the conveyance made to it by the Moon Lumber Company. Not only was this deed of trust taken after the original period for the removal of the timber had expired, but it contains a recital setting forth the two extension agreements as modifying the original timber deeds "as to the time within which said timber could be removed from said tracts of land". Having thus recognized the rights of the Sun Lumber Company under its vendor's lien, having entered into a contract with that company by which the latter was to withhold action against the bankrupt on the basis of this recognition, and having accepted security under a deed of trust which accorded priority to the rights of the Sun Lumber Company under the lien, the R. F. C., under the elementary principles of the law of estoppel, is precluded from denying these rights. Monroe County Court v. Hamlett, 101 W. Va. 673, 133 S.E. 363; Headley v. Hoopengarner, 60 W.Va. 626, 55 S.E. 744; Coal River Nav. Co. v. Webb, 3 W.Va. 438;

Gibson v. Lyon, 115 U.S. 439, 446, 6 S.Ct. 129, 29 L.Ed. 440; 21 C.J. 1072, 1111, 1112; 19 Am.Jur. 800.

■ On the third question the court below expressly found that the lumber yard upon which the lumber in controversy was stacked was located "upon the exact bottom land, on the northerly side of Blue Creek, at the mouth of Board Tree Hollow, consisting of about four acres, the use of which was granted in the deed conveying such timber to bankrupt". A careful examination of the testimony convinces us not only that this finding is supported by ample testimony but also that it is clearly right. This being true, the vendor's lien has not been lost, for the lumber has not been removed from the premises. The right of the vendee of the timber rights to use this particular lumber yard was expressly granted by the vendor; and the yard was upon its land. Certainly the original vendor of the timber rights had such rights of possession over the lumber yard as were necessary to the existence of a vendor's lien; and, as pointed out above, the Moon Lumber Company was vested with such rights of possession in the premises as were necessary to the enforcement of the vendor's lien on lumber cut therefrom. The fact that the lumber yard was on a tract adjoining the tract from which the lumber was cut is immaterial. As was well said by Judge Poffenbarger, speaking for the Supreme Court of Appeals of West Virginia in Acadian Coal & Lumber Co. v. Brooks Run Lumber Co., supra, 88 W.Va. 595, 107 S.E. 422, 427: "The word 'premises,' however, does not necessarily mean the 1,430-acre tract of land. It means all of the grounds or tracts of land on which the lumber operations are conducted. The purpose of the recorded reservation is to give notice to purchasers and fix the status of lien creditors. It is not unusual for the mill and lumber yards of such an operation as is described in the deed to be located on a lot or parcel of land near to or adjoining the tract from which the timber is taken for manufacture. It would be unreasonable to suppose all of the lumber manufactured from timber on a tract of land is to be either sawed or stacked on the land from which it is taken. A practical man would say 'premises' as used here refers to the mill site and yards, whether on the granted land or not, as well as the land from which the timber is cut,

and the term is to be taken in the sense in which a practical man would employ it. The mill site and lumber yards were shown, by extrinsic evidence, to be in this case on a 56-acre tract of land owned by the grantors, and not included in the 1,430-acre tract. Our conclusion is that the lien extended to timber cut and lumber manufactured while at the mill and on the lumber yard awaiting transportation in some way."

■ Coming to the fourth question, we do not think that there was anything in the agreements between the Sun Lumber Company and the Reconstruction Finance Corporation which destroyed the vendor's lien on the lumber here in controversy. The provision of the stand-by agreement to the effect that the lumber might be sold by the bankrupt and $3.50 per thousand applied upon the amount due under the vendor's lien, amounted, of course, to a release of the lien as to the lumber actually sold by the bankrupt. The lumber here in question was not sold, however, and the provision has no application to it. It was stacked upon the premises, as we have seen; and the right of the Sun Lumber Company, upon the occurrence of bankruptcy, to enforce the vendor's lien which attached to it so long as it remained upon the premises was protected by the provision of the stand-by agreement that upon the occurrence of bankruptcy any stand-by creditor not responsible for instituting same might proceed with the enforcement of his claims. The Reconstruction Finance Corporation argues that the Sun Lumber Company waived its lien by consenting in the standby agreements to the pledge of the lumber. It appears, however, that the consent related to the pledge of lumber at Fenwick and Summerville, not that at Sanderson, and that the Sun Lumber Company never at any time consented to the pledge of the lumber here involved. Even if it knew of the pledge, it could not be held to have consented to the waiver of the priority of its lien so long as all that was done was consistent with the existence of the lien, and the pledge of the lumber on the premises was certainly consistent therewith.

### The Wage Claims

The court below awarded to wage claimants wages aggregating $7,235.85 earned prior to November 20, 1935, wages ag-

gregating $3,612.35 earned between November 30, 1935, and January 6, 1939, which was three months prior to the filing of the petition in bankruptcy, and wages aggregating $1,059.58 earned within the three months period. The court held that claims in these respective amounts constituted liens upon the lumber at Sanderson and Fenwick, in a proportion not questioned, and that, with respect to the Sanderson lumber, they were entitled to priority over all other liens except the vendor's lien of the Sun Lumber Company, which we have discussed. The wage claimants were parties to the stand-by agreements which provided that they would not sue upon their claims or do anything else that might bring about liquidation but that, in the event of bankruptcy, they might (upon certain conditions which have been performed) enforce any of their claims, notwithstanding such stand-by agreements. Claimants rely upon W.Va.Code of 1937, ch. 38, art. 2, sec. 31, which is as follows: "Every workman, laborer or other person who shall do or perform any work or labor, for any incorporated company doing business in this State, by virtue of a contract either directly with such incorporated company or with its general contractor or with any subcontractor, shall have a lien for the value of such work or labor upon all real estate and personal property of such company, and such lien shall have priority over any lien created by deed or otherwise on such real estate or personal property, subsequent to the time when such labor was performed, but there shall be no priority of lien as between the parties claiming under the provisions of this section."

In the court below it was not questioned that the labor liens had been perfected under the West Virginia law so as to be valid statutory liens. In their brief filed in this court counsel for the Reconstruction Finance Corporation urge for the first time, as they admit, that the lien of the wage claims was discharged because no suit was brought in a chancery court for their enforcement within ninety days after completion of the labor performed as provided by sec. 32 of art. 2, ch. 38 of the Code, counsel stating very frankly that this point was not thought of in the court below. They also urge here for the first time that certain of the claimants had taken notes from the bankrupt for a portion of the claims and that one of them, a physician, was not a workman, laborer or other person performing work or labor within the meaning of the act. These points, however, not having been raised in the court below, may not be considered here, since the case presents none of the unusual and exceptional circumstances which would justify an appellate court in considering a point not raised in the court below; and the rule is well settled that ordinarily points not raised in the trial court will not be considered on appeal. Hutchinson v. Fidelity Inv. Ass'n, 4 Cir., 106 F.2d 431, 436, 133 A.L.R. 1061; Deutser v. Marlboro Shirt Co., 4 Cir., 81 F.2d 139, 143; Kimble v. Kiser, 4 Cir., 59 F.2d 626, 628; H. E. Wolfe Const. Co. v. Fersner, 4 Cir., 58 F.2d 27, 29. The questions before us are (1) whether the court erred in according the wage claims priority over the liens of the Reconstruction Finance Corporation arising out of the pledge of the lumber to it, and (2) whether the liens of the wage claimants should be limited in amount under sec. 67, sub. c of the Bankruptcy Act, 11 U.S.C.A. § 107, sub. c, to wages earned within three months of the filing of the petition, not to exceed $600 to each claimant.

On the first of these questions, we think it clear that the liens of the wage claimants, subject to the prior claim of the Sun Lumber Company under its vendor's lien, constituted liens upon the logs as cut from the standing timber and upon the lumber as it was sawed from the logs by the bankrupt and before it was delivered under pledge to the Reconstruction Finance Corporation. Consequently the pledge to the Reconstruction Finance Corporation was subject to these liens of the wage claimants. It is argued against this that there was an agreement to pledge this lumber before it was delivered in pledge and that when delivered the pledge related back to the original agreement. The lien of the pledge, however, became valid at law only when possession was delivered (Casey v. Cavaroc, 96 U.S. 467, 24 L.Ed. 779); and prior thereto the lien of the laborers under the West Virginia statute had attached to the lumber as it was sawed. The equity of the Reconstruction Finance Corporation under the pledge agreement was certainly not superior to that of the laborers and workmen whose labor enabled the bankrupt to carry forward its operations; and between such conflicting equi-

ties the prior legal right of the wage claimants should prevail. Casey v. Cavaroc, supra. Just as in the case of the attachment of the lien of a mortgage to after acquired property, the lien of the pledge attaches to lumber pledged pursuant to prior agreement subject to valid liens which have attached to it prior to the delivery in pledge. Cf. United States v. New Orleans Railroad, 12 Wall. 362, 20 L.Ed. 434; Shooters Island S. Co. v. Standard Shipbuilding Corp., 3 Cir., 293 F. 706, 712.

Nor do we think that the liens of the wage claimants are limited, as the Reconstruction Finance Corporation contends, by sec. 67, sub. c of the Bankruptcy Act. That section provides: "c. Where not enforced by sale before the filing of a petition in bankruptcy * * *, statutory liens * * * on personal property not accompanied by possession of such property * * * shall be postponed in payment to the debts specified in clauses (1) and (2) of subdivision a of section 64 of this act [104 of this title] and, except as against other liens, such liens for wages or for rent shall be restricted in the amount of their payment to the same extent as provided for wages * * * in subdivision a of section 64 of this act [104 of this title]."

■ The effect of this provision, as pointed out by the judge below, is to limit liens for wages valid under state law as against common creditors of a bankrupt, but not as against other lien claimants; and, since the claims of the lien claimants here are more than sufficient to absorb the fund and common creditors will not share in it, the limitation prescribed by the section is not applicable. Cf. Sehon-Stevenson & Co. v. Union Trust Co., 4 Cir., 113 F.2d 968, 971. This is the clear meaning of the language used in the section. As said in Remington on Bankruptcy, vol. 6, 1941 Supp., page 48, sec. 2785.01: *"Except as against other liens,* liens for wages shall be restricted in the amount of their payment in bankruptcy to not more than $600 to each claimant earned within three months before the date of the commencement of the proceeding in bankruptcy." (Italics supplied.)

■ As the wage claimants held valid liens on the lumber under the statute of West Virginia, they were entitled to enforce same, as against the liens of other claimants, under sec. 67, sub. b of the Bankruptcy Act, which provides: "b. The provisions of section 60 of this Act [96 of this title] to the contrary notwithstanding, statutory liens in favor of employees, contractors, mechanics, landlords, or other classes of persons, and statutory liens for taxes and debts owing to the United States or any State or subdivision thereof, created or recognized by the laws of the United States or of any State, may be valid against the trustee, even though arising or perfected while the debtor is insolvent and within four months prior to the filing of the petition in bankruptcy or of the original petition under chapter 10, 11, 12, or 13 of this Act [title] by or against him. Where by such laws such liens are required to be perfected and arise but are not perfected before bankruptcy, they may nevertheless be valid, if perfected within the time permitted by and in accordance with the requirements of such laws, except that if such laws require the liens to be perfected by the seizure of property, they shall instead be perfected by filing notice thereof with the court."

As the vendor's lien and the liens of the wage claimants amount to more than the fund derived from the sale of the lumber, it is unnecessary to consider the lien of the Sun Lumber Company under its deed of trust. We would point out, however, that, as the deed of trust was upon the timber and as no part of it could be cut and sold without affecting the security, the case would seem to be very different from that of a mortgage on land where the mortgagor or trustor is ordinarily entitled to lumber cut therefrom until decree is entered sequestering the income.

There was no error and the order of the District Court will be affirmed.

Affirmed.